PEOPLE v DENDEL (ON SECOND REMAND)

Docket No. 247391. Submitted October 29, 2009, at Lansing. Decided August 24, 2010, at 9:00 a.m.

Katherine S. Dendel was convicted of second-degree murder in the Jackson Circuit Court, Chad C. Schmucker, J. Experts for the prosecution had testified that the deceased, Paul M. Burley, defendant's domestic partner, had died as the result of an insulin injection, and the court determined that defendant had killed Burley by injecting him with the insulin. The Court of Appeals, BORRELLO, P.J., and SAAD, J. (WILDER, J., dissenting), in an unpublished opinion per curiam, issued July 18, 2006 (Docket No. 247391), reversed the conviction and remanded the case to the trial court for a new trial on the basis of defendant's claim of ineffective assistance of counsel. The Supreme Court reversed the judgment of the Court of Appeals and remanded the case to the Court of Appeals for consideration of defendant's remaining issues raised on appeal. 481 Mich 114 (2008). On remand, the Court of Appeals, BORRELLO, P.J., SAAD, C.J., and WILDER, J., affirmed defendant's conviction in an unpublished opinion per curiam, issued September 11, 2008 (Docket No. 247391). The Supreme Court, in lieu of granting leave to appeal, vacated in part the judgment of the Court of Appeals and remanded the case to the Court of Appeals for reconsideration of defendant's Confrontation Clause and hearsay issues in light of the United States Supreme Court's decision in *Melendez-Diaz v Massachusetts*, 557 US ___; 129 S Ct 2527; 174 L Ed 2d 314 (2009). 485 Mich 903 (2009).

On second remand, the Court of Appeals *held*:

1. The statements that Burley died with a glucose level of zero that were contained in the toxicology report prepared by employees of AIT Laboratories after the medical examiner's original findings had been challenged were testimonial statements. The toxicology testing was performed in anticipation of a criminal trial. The authors of the statements were subject to confrontation under the Sixth Amendment.

2. *People v Lewis* (*On Remand*), 287 Mich App 356 (2010), is not factually analogous to this case and is not binding under the principle of stare decisis. While the Court in *Lewis* ruled that the

autopsy report involved in that case was not testimonial because it was prepared pursuant to a legal duty, the statements in the toxicology report in this case were not prepared pursuant to a legal duty but were instead prepared in anticipation of a criminal trial. In addition, the autopsy report in *Lewis* did not address the pivotal issue in that case, while the cause of Burley's death was a primary factual question in this case.

3. The nontestifying lab technicians' findings that Burley's glucose level was zero at the time of death was the fact on which the testifying AIT employee based his opinion that an insulin injection was a possible cause of Burley's death. Although the statement concerning a glucose level of zero had no independent incriminating effect, it was an accusatory statement under *Melendez-Diaz* because it supported the prosecution's theory that defendant killed Burley by injecting him with insulin. While the glucose-level finding was purportedly the result of neutral scientific testing, the Court in *Melendez-Diaz* ruled that such testing is not exempt from the Confrontation Clause because of the possibility of error or bias.

4. The technicians' statement of a zero-glucose finding comported with the factors indicating a testimonial statement subject to the Confrontation Clause delineated in *Davis v Washington*, 547 US 813 (2006), and analyzed in *People v Bryant*, 483 Mich 132 (2009). The classifying of a statement as a fact in support of an expert's conclusion rather than the conclusion itself does not negate evidentiary or Confrontation Clause concerns.

5. The glucose report was not admissible under the hearsay exception for public records because the report was obtained in response to the medical examiner's request in the course of investigating a suspicious death. In addition, *Crawford v Washington*, 541 US 36 (2004), provided that out-of-court statements are not exempt from confrontation merely because they come within a hearsay exception, including hearsay exceptions traditionally considered to be imbued with indicia of reliability.

6. Defendant's Sixth Amendment right to confront witnesses was violated when the testifying AIT employee was permitted to give hearsay testimony that other persons in the AIT laboratory had determined that Burley's glucose level was zero at the time of his death.

7. Defendant's failure to object to the hearsay evidence was reasonable in light of the state of law at the time of defendant's trial. Fundamental fairness requires that this issue be reviewed as though it had been fully preserved. Therefore, the standard of review is whether it is clear beyond a reasonable doubt that a

rational jury would have found defendant guilty absent the error. If it is beyond a reasonable doubt that the jury would have convicted defendant on the basis of the untainted evidence, she is not entitled to a new trial. In light of the medical examiner's testimony, defendant's position at trial that Burley could have taken insulin himself, and the circumstantial evidence surrounding Burley's death, it is clear beyond a reasonable doubt that a reasonable jury would have convicted defendant absent the inadmissible evidence regarding the toxicological results. The Confrontation Clause error was harmless beyond a reasonable doubt, and defendant is not entitled to a new trial.

Affirmed.

WILDER, J., concurring, agreed that under *Melendez-Diaz*, the statements concerning the toxicology testing preformed at AIT Laboratories, and, in particular, the glucose levels obtained as the result of the testing, were testimonial in nature and, therefore, that the testimony concerning the testing violated defendant's Sixth Amendment right to confront witnesses. He disagreed, however, that fundamental fairness requires imposition of the legal fiction proposed by the majority and the conclusion that the appropriate remedy for the violation should be a retroactive application of the right of confrontation, treating defendant's posttrial objection on Confrontation Clause grounds as having been made at trial and preserved, even though it actually was not.

1. CONSTITUTIONAL LAW — CONFRONTATION CLAUSE — RIGHT TO CONFRONT WITNESSES — TESTIMONIAL STATEMENTS.

The Sixth Amendment bars the admission of testimonial statements by a witness who does not appear at trial unless the witness is unavailable and the defendant had a prior opportunity to cross-examine the witness; a pretrial statement is testimonial if the declarant should reasonably have expected the statement to be used in a prosecutorial manner and the statement was made under circumstances that would cause an objective witness reasonably to believe that the statement would be available for use at a later trial.

2. CONSTITUTIONAL LAW — CONFRONTATION CLAUSE — RIGHT TO CONFRONT WITNESSES — NEUTRAL SCIENTIFIC TESTING RESULTS.

Findings that are alleged to be the result of neutral scientific testing are not exempt from challenge under the Confrontation Clause because of the possibility of error or bias with regard to such findings (US Const, Am VI).

*Michael A. Cox*, Attorney General, *B. Eric Restuccia*, Solicitor General, *Hank C. Zavislak*, Prosecuting Attorney, and *Jerrold Schrotenboer*, Chief Appellate Attorney, for the people.

State Appellate Defender (by *Valerie R. Newman*) for defendant.

ON SECOND REMAND

Before: BORRELLO, P.J., and SAAD and WILDER, JJ.

SAAD, J. In light of a recent United States Supreme Court case that further defines the scope of the rights granted under the Confrontation Clause, *Melendez-Diaz v Massachusetts*, 557 US ___; 129 S Ct 2527; 174 L Ed 2d 314 (2009), our Supreme Court remanded this case for us to address whether the trial court violated defendant's confrontation rights when it admitted expert testimony that was based on a report prepared by nontestifying forensic analysts. For the reasons set forth in this opinion, we affirm defendant's conviction because, though we hold that a Confrontation Clause violation occurred, the error was harmless beyond a reasonable doubt.

I. FACTS AND PROCEEDINGS

The trial court convicted defendant of second-degree murder, MCL 750.317, for causing the death of her domestic partner, Paul Michael Burley. At trial, the prosecution maintained that defendant injected Burley with insulin because she was frustrated and overwhelmed by the demands of attending to Burley's considerable medical needs. Defendant used insulin to treat her own diabetes, and she knew that insulin breaks down almost immediately upon death and can-

not be detected in a dead body. Defendant took the position at trial that Burley died from a morphine overdose or, if he died from an insulin injection, he committed suicide in order to relieve defendant of the burden of caring for him.

In *People v Dendel*, unpublished opinion per curiam of the Court of Appeals, issued July 18, 2006 (Docket No. 247391) (*Dendel I*), we reversed defendant's conviction and remanded for a new trial on the basis of defendant's claim of ineffective assistance of counsel. Our Supreme Court reversed and remanded this case for us to consider defendant's remaining issues raised on appeal. *People v Dendel*, 481 Mich 114; 748 NW2d 859 (2008). In *People v Dendel (On Remand)*, unpublished opinion per curiam of the Court of Appeals, issued September 11, 2008 (Docket No. 247391) (*Dendel II*), we affirmed defendant's conviction. Defendant sought leave to appeal, and, in leau of granting leave to appeal, the Supreme Court vacated in part this Court's judgment and remanded the case for reconsideration of defendant's Confrontation Clause and hearsay issues in light of *Melendez-Diaz. People v Dendel*, 485 Mich 903 (2009).

## II. OUR DECISION IN *DENDEL II*

Defendant's hearsay and Confrontation Clause arguments concern the testimony of Dr. Michael Evans. In *Dendel II*, we summarized the relevant facts as follows:

> Dr. Evans is a toxicologist at AIT Laboratories, and president and [chief executive officer] of the company. He manages the corporation and directs laboratory operations. AIT Laboratories provides services to the clinical community and hospitals throughout the county, as well as the pharmaceutical industry by performing research to aid in new drug development. The laboratory also performs fo-

rensic toxicology testing in autopsy cases. Dr. Evans described the logistics and procedures for autopsy testing at the request of medical examiners' offices.

Here, the laboratory performed a pane 1 autopsy test on a sample of Burley's blood, urine, and vitreous fluids at the request of Dr. John Mayno from the Jackson County Medical Examiner's office. Dr. Evans explained that in such cases, the technicians "proceed as if we have no information" and "proceed without any preconceived notion about what we're going to look for in starting our testing process." He testified at length about the procedures utilized in the lab, and the many substances that the autopsy tests identify.

Dr. Evans testified generally about the relationship between insulin and glucose levels, and the body's response to insulin. He explained the difficulty of testing for the presence of insulin during an autopsy. Dr. Evans then testified that the toxicology results showed that the level of glucose in Burley's system was zero. He opined that the zero glucose level was consistent with Burley having been injected with insulin. Defense counsel objected to the admission of Dr. Evans' testimony about the toxicology results as lacking proper foundation because Dr. Evans did not perform the autopsy test himself. Dr. Evans stated that about fifteen people from his lab were involved in the testing. The trial court ruled that an adequate foundation had been laid for the admission of Dr. Evans' testimony, and that the toxicology results came within the exception to the hearsay rule for business records. [*Dendel II*, unpub op at 2.]

Defendant argued in *Dendel II* that the trial court abused its discretion by admitting Dr. Evans's testimony about the results of toxicology tests of Burley's bodily fluids because Dr. Evans did not perform the tests. *Id.* Citing *Crawford v Washington*, 541 US 36; 124 S Ct 1354; 158 L Ed 2d 177 (2004), defendant contended that the admission of this hearsay testimony violated her rights under the Confrontation Clause. Because

defendant failed to preserve this issue with a timely challenge to Dr. Evans's testimony based on the Confrontation Clause, we reviewed the matter for plain error affecting her substantial rights. *Dendel II*, unpub op at 3. We concluded that the statements contained in the toxicology report were not testimonial, and they could be admitted without affording defendant an opportunity to cross-examine the analysts from the lab. We distinguished the toxicology report from the laboratory report that was deemed inadmissible in *People v Lonsby*, 268 Mich App 375; 707 NW2d 610 (2005):

> "Defendant relies on *Lonsby, supra*, a sexual assault case in which this Court ruled that the notes and laboratory report of a nontestifying serologist were testimonial in nature, and were admitted in violation of the defendant's Sixth Amendment right to confront witnesses against him. However, in *Lonsby*, this Court clarified:

> "The critical point . . . is the distinction between an expert who forms an opinion based in part on the work of others and an expert who merely summarizes the work of others. In short, one expert cannot act as a mere conduit for the opinion of another." [*Lonsby, supra* at 393 n 12, quoting *State v Williams*, 253 Wis 2d 99, 113; 644 NW2d 919 (2002).]

> This "critical point" makes *Lonsby* distinguishable from the present case. Here, unlike in *Lonsby*, the witness did not testify to subjective observations from the toxicologists who performed the autopsy test. Dr. Evans did not speculate about any reasoning or judgment exercised by the nontestifying toxicologists. *Id.* at 392. The zero-level of glucose in Burley's system was an objective result, and Dr. Evans formed his own expert opinion on the basis of that finding. And unlike the police crime lab serologist in *Lonsby*, Dr. Evans was not employed by law enforcement. He testified that the lab testing is performed without any preconceived notions about what might be found, and without any case background.

> Additionally, autopsy reports are not testimonial because they are public records prepared pursuant to a duty imposed by law as part of the statutorily defined duties of a medical examiner. See MCL 52.202(1)(a) (mandating a medical examiner to conduct an autopsy when the deceased's death was unexpected), MCL 52.207 (mandating a medical examiner to conduct an autopsy upon the order of a prosecuting attorney). Therefore, the autopsy and toxicology reports qualify as public records under MRE 803(8). Thus, the toxicology results were not testimonial in nature, and Dr. Evans' testimony based on the results did not violate defendant's rights under the Confrontation Clause. [*Dendel II*, unpub op at 3-4.]

After we issued our opinion in *Dendel II*, the United States Supreme Court issued its decision in *Melendez-Diaz*. Because this decision directly addressed the question of a defendant's confrontation rights in the context of laboratory reports prepared by nontestifying witnesses, our Supreme Court remanded *Dendel* to this Court in order to reexamine Confrontation Clause issues arising from Dr. Evans's reliance on glucose-level findings made by nontestifying personnel at AIT Laboratories.

### III. CONFRONTATION CLAUSE JURISPRUDENCE

To decide whether the admission of hearsay evidence violated defendant's due-process right to confront witnesses, we must examine recent Supreme Court decisions interpreting the Confrontation Clause. Hearsay is "a statement, other than the one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." MRE 801(c); *People v McLaughlin*, 258 Mich App 635, 651; 672 NW2d 860 (2003). Generally, hearsay is inadmissible unless it comes within an exception to the hearsay rule. *McLaughlin*, 258 Mich App at 651. Con-

troversies over the admission of hearsay statements may also implicate the Confrontation Clause, US Const, Am VI, which guarantees a criminal defendant the right to confront the witnesses against him or her. See also Const 1963, art 1, § 20.

In *Crawford*, 541 US at 53-54, the United States Supreme Court held that the Sixth Amendment bars the admission of testimonial statements by a witness who does not appear at trial unless the witness is unavailable and the defendant had a prior opportunity to cross-examine the witness. A pretrial statement is testimonial if the declarant should reasonably have expected the statement to be used in a prosecutorial manner and if the statement was made under circumstances that would cause an objective witness reasonably to believe that the statement would be available for use at a later trial. *Id.* at 51-52; *Lonsby*, 268 Mich App at 377. In *Davis v Washington*, 547 US 813, 817-822; 126 S Ct 2266; 165 L Ed 2d 224 (2006), the Supreme Court considered whether statements that a crime victim made to a 911 emergency operator describing an ongoing assault were testimonial statements subject to confrontation under the Confrontation Clause. The Court ruled that the statements were not testimonial. *Id.* at 829. However, in the companion case, *Hammon v Indiana*, police officers responding to a report of a domestic disturbance questioned the alleged victim regarding the assault that had just taken place. When the police first arrived, the victim denied that any assault had occurred, but when the officers questioned her outside the defendant's presence, she signed an affidavit stating that the defendant had assaulted her. *Id.* at 820-821. The Court concluded that these statements were testimonial because they were made in response to an investigation of possible criminal con-

duct that had occurred in the past, rather than an ongoing situation. *Id.* at 829-830.

The Supreme Court held that statements are not testimonial "when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency." *Davis,* 547 US at 822. On the other hand, "[t]hey are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Id.* The Court in *Davis* further explained that "in the final analysis [it is] the declarant's statements, not the interrogator's questions, that the Confrontation Clause requires us to evaluate." *Id.* at 822 n 1; see also *People v Bryant,* 483 Mich 132, 139-140; 768 NW2d 65 (2009), cert gtd 559 US ___; 130 S Ct 1685; 176 L Ed 2d 179 (2010).

In *Bryant,* 483 Mich at 140, our Supreme Court observed that *Davis* differed from *Crawford* because, in *Davis* (1) the victim was speaking about events as they were happening, rather than describing past events, (2) the victim was experiencing an ongoing emergency, (3) the victim's statements were made to help address the ongoing emergency, rather than to disclose past events, and (4) the victim made the statements frantically, rather than in a tranquil or safe environment. The Court in *Bryant* also set forth the factors that tended to establish that the statements in *Hammon* were testimonial: (1) the statements were made in response to an interrogation that was part of an investigation into " 'possibly criminal past conduct,' " (2) the statements were not made contemporaneously with an ongoing emergency, and (3) the officer's questions were not

intended to learn what was happening, but what had already happened. *Id.* at 141, citing *Davis*, 547 US at 829-830.

After we issued our opinion in *Dendel II*, the United States Supreme Court issued its decision in *Melendez-Diaz*. The prosecution had charged the defendant in *Melendez-Diaz* with narcotics-trafficking offenses. In order to prove that the substance in question was cocaine of a certain quantity, the prosecution introduced into evidence sworn certificates of state laboratory analysts documenting the results of tests performed on the material seized by the police. *Melendez-Diaz*, 557 US at ___; 129 S Ct at 2531; 174 L Ed 2d at 320-321. Building on the principles established in *Crawford* and *Davis*, a majority[1] of the Supreme Court determined that the certificates constituted testimonial statements because they were made under circumstances in which an expert witness would anticipate their future use at trial and also because they served as the " 'prima facie evidence of the composition, quality, and the net weight' of the analyzed substance" under the relevant Massachusetts statutes. *Id.* at ___; 129 S Ct at 2532; 174 L Ed 2d at 321 (citation omitted). The Court concluded that, "[a]bsent a showing that the analysts were unavailable to testify at trial *and* that petitioner had a prior opportunity to cross-examine them, petitioner was entitled to ' "be confronted with" ' the analysts at trial." *Id.* at ___; 129 S Ct at 2532; 174 L Ed 2d at 322, quoting *Crawford*, 541 US at 54. In response to the dissenting justices, the majority explained in a footnote that its ruling did not require "that anyone whose testimony may be relevant in establishing the chain of custody, authenticity of the sample, or accuracy of the testing device" was required

---

[1] Justice Scalia, joined by Justices Stevens, Souter, Thomas, and Ginsburg.

to testify in person; rather, it was "up to the prosecution to decide what steps in the chain of custody are so crucial as to require evidence; but what testimony *is* introduced must (if the defendant objects) be introduced live." *Melendez-Diaz*, 557 US at ___ n 1; 129 S Ct at 2532 n 1; 174 L Ed 2d at 322 n 1.

Responding to various other arguments raised by the dissent and the prosecution, the Court rejected the assertion that the analysts were not "accusatory" witnesses, and therefore not subject to confrontation. The Court commented that the Confrontation Clause "contemplates two classes of witnesses"—those against the defendant and those in his favor—omitting a third category of witnesses who were "helpful to the prosecution, but somehow immune from confrontation." The Court was not persuaded that the analysts' statements were exempt from the Confrontation Clause on the ground that the statements were not independently sufficient to establish the defendants' guilt. *Id.* at ___; 129 S Ct at 2533-2534; 174 L Ed 2d at 323. The Court also was not persuaded by the attempt of the prosecution and the dissent to distinguish the analysts' statements from " 'conventional' " or " 'typical' " ex parte testimony when the witness observed the crime or human action related to it or when the witness's statements were given in response to interrogation. *Id.* at ___; 129 S Ct at 2534-2536; 174 L Ed 2d at 324-325.

The Court in *Melendez-Diaz* also rejected the dissent's and the prosecution's arguments that the reliability of objective, neutral scientific testing obviated the need for confrontation and that cross-examination was an inferior method of challenging scientific testing. The Court stated:

> Respondent and the dissent may be right that there are other ways—and in some cases better ways—to challenge

or verify the results of a forensic test. But the Constitution guarantees one way: confrontation. We do not have license to suspend the Confrontation Clause when a preferable trial strategy is available. Nor is it evident that what respondent calls "neutral scientific testing" is as neutral or as reliable as respondent suggests. Forensic evidence is not uniquely immune from the risk of manipulation. . . . *A forensic analyst responding to a request from a law enforcement official may feel pressure—or have an incentive—to alter the evidence in a manner favorable to the prosecution.* [*Id.* at ___; 129 S Ct at 2536; 174 L Ed 2d at 326 (emphasis added).]

The Court further commented that confrontation could help "weed out" both fraudulent analysts and incompetent analysts. *Id.* at ___; 129 S Ct at 2537; 174 L Ed 2d at 326.

Finally, the Court in *Melendez-Diaz* addressed the argument that the analysts' affidavits were admissible without subjecting the analysts to confrontation under the business-records exception to the hearsay rules. The Court concluded that the certificates were not admissible as business records because they were more akin to reports generated by law-enforcement officials. *Id.* at ___; 129 S Ct at 2538; 174 L Ed 2d at 328. The Court further commented that the prosecution misunderstood the relationship between the hearsay exception for business and official records and the Confrontation Clause. The Court stated:

*Business and public records are generally admissible absent confrontation not because they qualify under an exception to the hearsay rules, but because—having been created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial—they are not testimonial.* Whether or not they qualify as business or official records, the analysts' statements here—prepared specifically for use at petitioner's trial— were testimony against petitioner, and the analysts were

subject to confrontation under the Sixth Amendment. [*Id.*
at ___; 129 S Ct at 2539-2540; 174 L Ed 2d at 329-330
(emphasis added).]

The Court demurred to the dissent's remaining asser-
tions that its holding drastically departed from prior
jurisprudence or that it would "commence the parade of
horribles" unfairly hampering prosecution of drug
charges. *Id.* at ___; 129 S Ct at 2542; 174 L Ed 2d at 332.

Several post-*Melendez-Diaz* cases have addressed
Confrontation Clause issues in the context of autopsy
reports or similar reports containing scientific data. In
*People v Lewis,* unpublished opinion per curiam of the
Court of Appeals, issued April 15, 2008 (Docket No.
274508), this Court had ruled that no Confrontation
Clause violation occurred when the medical examiner
testified with regard to an opinion based on an autopsy
report prepared by two nontestifying medical examin-
ers. The Supreme Court, in lieu of granting leave to
appeal, vacated in part the judgment of the Court of
Appeals and remanded the case to the Court of Appeals
for reconsideration of this issue in light of *Melendez-
Diaz. People v Lewis,* 485 Mich 878 (2009). On remand,
this Court ruled that the autopsy report was not testi-
monial. The Court distinguished the autopsy report
from the certificates in *Melendez-Diaz* because the
certificates were prepared for the sole purpose of pro-
viding prima facie evidence against the defendant at
trial, whereas the autopsy report was prepared pursu-
ant to a duty imposed by statute. *People v Lewis (On
Remand),* 287 Mich App 356, 362-363; 788 NW2d 461
(2010). The Court further commented that "unlike the
way the certificates in *Melendez-Diaz* were used, Dr.
[Carl] Schmidt [the testifying medical examiner]
formed independent opinions based on objective infor-
mation in the autopsy report and his opinions were

subject to cross-examination." *Id.* at 363. The Court also noted that the autopsy report "was not outcome determinative" because " '[t]here is no dispute that a crime was committed, and the autopsy did not aid in establishing the identity of the perpetrator, which was the central issue in this case.' " *Id.*, quoting *Lewis*, unpub op at 5. (The autopsy report was not necessary to establish that the victim died of multiple stab wounds.)

In *Commonwealth v Avila*, 454 Mass 744, 760; 912 NE2d 1014 (2009), the Massachusetts Supreme Judicial Court held that a substitute medical examiner could testify about his own opinions and conclusions concerning the cause of the decedent's death, though his opinions were based on findings set forth in an autopsy report prepared by his predecessor, who did not testify at trial. However, the court held that the substitute medical examiner could not testify about the facts and findings themselves on direct examination. *Id.* at 760-761. The court explained that an expert without first-hand knowledge of the facts at issue is permitted to state an expert opinion based on facts assumed in hypothetical questions or on data properly admitted into evidence. *Id.* at 761. The court stated:

> Expert opinion testimony of this nature does not offend the confrontation clause as interpreted by the Supreme Court of the United States in *Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004) (*Crawford*) (confrontation clause prohibits admission of testimonial out-of-court statements unless declarant unavailable and defendant had prior opportunity to cross-examine declarant about statements), and most recently in *Melendez-Diaz v. Massachusetts*, [557 US ___] 129 S. Ct. 2527, 174 L. Ed. 2d 314 (2009) (deeming certificates of forensic laboratory analysis offered in evidence in lieu of testimony as testimonial, and thus subject to *Crawford*, because certificates were affidavits prepared for sole purpose of serving as evidence at trial). [*Id.* at 762.]

The Massachusetts Supreme Judicial Court held that the trial court erred when it allowed the substitute medical examiner to testify on direct examination regarding the findings in the autopsy report, but it concluded that the unpreserved error "did not result in a substantial likelihood of a miscarriage of justice" because the erroneously admitted testimony was cumulative of other properly admitted evidence. *Id.* at 763.

In *State v Locklear*, 363 NC 438; 681 SE2d 293 (2009), the state's chief medical examiner, Dr. John Butts, testified about the victim's cause of death on the basis of an autopsy report that he did not prepare. He also testified about the identification of the victim on the basis of forensic dentistry. The pathologist who performed the autopsy, Dr. Karen Chancellor, and the dentist who made the identification, Dr. Jeffrey Burkes, did not testify. *Id.* at 451. The North Carolina Supreme Court held that "[t]he admission of such evidence violated defendant's constitutional right to confront the witnesses against him . . . ." *Id.* at 452. However, the court held that the error was harmless beyond a reasonable doubt because the defendant's guilt was established by substantial admissible evidence, including his own confession. *Id.* at 452-453.

Following *Melendez-Diaz*, at least two courts have held that factual statements from nontestifying forensic analysts may be used to support the conclusions and opinions of testifying expert witnesses. In *People v Johnson*, 394 Ill App 3d 1027; 915 NE2d 845 (2009), the prosecution introduced evidence that the defendant's DNA matched a semen stain found at the crime scene. The prosecution introduced the evidence through the testimony of a DNA analyst, Charlotte Word, who reviewed DNA testing conducted by others. *Id.* at 1029. Ms. Word testified that she was able to determine from

the notes and documentation in the laboratory folder that the proper procedures were followed with the appropriate control tests. *Id.* Brian Schoon, who performed the tests, also testified, but the analysts who prepared the defendant's sample profile did not. *Id.* at 1030. The defendant argued that this violated his Confrontation Clause rights because he did not have the opportunity to cross-examine any of the analysts who prepared the profile. *Id.* The court found no error, stating:

> Word, a Cellmark analyst, testified about the laboratory's procedures and practices regarding DNA testing, though she did not participate in the testing. She used the report that was prepared as the basis of her expert opinion that the proper procedures were followed in the analysis. Defendant's attorney was able to cross-examine Word about the basis of her opinion and called attention to the fact that she did not participate in the testing and that she assumed that the analysts properly documented each part of the testing, as required by Cellmark. The same reasoning holds true for Schoon. He used the Cellmark report as the basis for part of his opinion that the male DNA profiled [sic] obtained from the crime scene matched defendant's DNA. The Cellmark report was not offered to prove the truth of its contents, but was used as part of the bases for two experts' opinions. Accordingly, we find no *Crawford* violation in this case, and thus, no error. [*Id.* at 1034.]

The court also noted that DNA analysis results are not "accusatory" because they might lead to either incriminatory or exculpatory results. *Id.* at 1035.

In *Johnson*, the Illinois court ruled that its analysis under *Crawford* was not altered by the Supreme Court's decision in *Melendez-Diaz*. The court quoted the footnote in *Melendez-Diaz* disclaiming the inference that all persons involved in the chain of custody, authenticity of the sample, or accuracy of the testing

device were required to give live testimony. *Id.* at 1036-1037. The court also stated:

> Significantly, the decision in *Melendez-Diaz* did not reach the question of whether the analyst who conducted the scientific tests must testify at a defendant's trial, which is the issue raised by defendant in the instant case. In contrast with certificates presented at trial in *Melendez-Diaz*, Word and Schoon each testified in person as to their opinions based on the DNA testing and were subject to cross-examination. [*Id.* at 1037.]

The court held that "the holding in *Melendez-Diaz* is distinguishable from instances in which a witness testifies at trial about scientific analyses in which he or she did not participate in the analysis . . . ." *Id.* at 1038.

The court in *Johnson* relied substantially on a decision from the California Court of Appeal, *People v Rutterschmidt*, 176 Cal App 4th 1047; 98 Cal Rptr 3d 390 (2009). In *Rutterschmidt*, two codefendants, Olga Rutterschmidt and Helen Golay, were accused of fatally drugging one of their victims, Kenneth McDavid, to collect money from fraudulently obtained life insurance policies. Golay, but not Rutterschmidt, objected on Confrontation Clause grounds to the testimony of Joseph Muto, the chief laboratory director of the Los Angeles County Department of Coronor, who testified about the presence and quantity of prescription drugs and alcohol found in McDavid's blood samples. The court summarized Muto's testimony regarding his involvement in the testing as follows:

> Muto offered expert testimony as to the results of the toxicology analyses performed on samples of McDavid's blood. The testing was done under his supervision, and he signed the two reports containing the testing results. As the chief laboratory director, Muto had degrees and a license in toxicology and was a certified blood-alcohol analyst. He explained that in conducting toxicology analy-

ses, criminalists in the laboratory performed tests on samples of biological material taken during autopsies. Four laboratory criminalists under his supervision performed the testing on McDavid's samples. Muto was familiar with all the criminalists in the laboratory. With regard to every toxicology report issued from his laboratory, he conducted either an administrative review or a peer review. In the former, before certifying the testing results, he would review the entire case to verify compliance with proper procedures and scientific standards, including quality control. As a peer reviewer, he acted as a second chemical analyst to ensure a sufficient informational foundation for the original analyst's conclusions. All final reports go out under his signature, reflecting that he examined the documentation and analytical work comprising the final report. [*Id.* at 1071.]

Muto verified that the analyses were performed according to laboratory procedures and that he reviewed the reports. *Id.* at 1072.

The court in *Rutterschmidt* commented that there was "no federal Supreme Court or California authority for the proposition that *Crawford* precludes a prosecution scientific expert from testifying as to an opinion in reliance upon another scientist's report." *Id.* at 1073. The court rejected Golay's argument that the Supreme Court's decision in *Melendez-Diaz* warranted a different result. It distinguished the toxicological findings from the sworn certificates in *Melendez-Diaz* on the ground that the former were not sworn affidavits entered into evidence. The court stated:

Here, in contrast, the toxicological findings were not proved by means of an affidavit. As we have shown, Muto testified as a qualified expert, subject to cross-examination, that his review of data obtained under his supervision supported his conclusion as to the presence of alcohol and drugs in biological samples taken from McDavid's body. The *Melendez-Diaz* decision did not reach the question of

whether such expert testimony runs afoul of *Crawford*. Indeed, the lead opinion speaks for a court majority only on the narrow basis set forth in Justice Thomas's concurring opinion—"that 'the Confrontation Clause is implicated by extrajudicial statements only insofar as they are contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions.' [Citations.]" (*Melendez-Diaz, supra*, [557] U.S. at p. ___, 129 S. Ct. at p. 2543, [174 L Ed 2d at 333] (conc. opn. of Thomas, J.).) Accordingly, the testimony challenged by defendant Golay does not fall within the *Melendez-Diaz* majority's holding. [*Id.* at 1075.]

The court affirmed Golay's conviction. *Id.* at 1087. On December 2, 2009, the California Supreme Court granted Golay's petition for review, limited to the issue whether Muto's testimony violated Golay's right to confront witnesses and whether the decision in *Melendez-Diaz* affected the decision. *People v Rutter-schmidt*, 102 Cal Rptr 3d 281; 220 P3d 239 (2009).

We also take into consideration two cases decided before *Melendez-Diaz* that addressed the issue of hearsay evidence to establish objective data underlying an expert's opinion. In *United States v Richardson*, 537 F3d 951 (CA 8, 2008), a case involving DNA evidence that linked the defendant to a firearm, the prosecution called Alyssa Bance, a forensic scientist with the Minnesota Bureau of Criminal Apprehension. The court summarized Bance's testimony as follows:

Bance testified about DNA testing performed by another scientist in the office, Jacquelyn Kuriger. Bance testified that she personally "didn't actually receive the evidence in this case," but instead "received the case file with [Kuriger's] notes and results." Bance did, however, perform a peer review, in which she "look[ed] for basically everything down to that the i's are dotted and the t's are crossed. And if there's anything crossed out, are they initialed." Bance looked to make sure "everything is . . .

complete from the start of the case in the analysis to the end of the DNA results and the report." Bance testified, generally, the role of the peer reviewer is to "go through all of the case notes and documentation" the initial scientist did "to be sure that everything has been done properly and documented properly." Bance testified that "[t]he peer reviewer in a DNA case also does a second independent analysis of the DNA data and compares" it to the first scientist's review "to be sure that the two scientists agree in all aspects of the DNA testing." [*Id.* at 955-956.]

Bance "did not perform or witness any DNA testing of the samples," but "testified as to the tests Kuriger performed and the procedures and controls Kuriger used, as well as the results of Bance's own independent analysis of Kuriger's data." Bance "admitted her only knowledge of the tests was from reviewing the paperwork Kuriger generated, conducting a second independent analysis of Kuriger's data, and comparing her analysis of the data with Kuriger's analysis of the same data." *Id.* at 956. Reviewing the Confrontation Clause issue under the plain-error standard for unpreserved issues, the court concluded that the error, if any, was not plain error. The court noted that neither the United States Supreme Court nor the United States Court of Appeals for the Eighth Circuit had addressed the question whether DNA samples and related testimony were testimonial. It commented that other federal courts had ruled that DNA samples themselves are not testimonial. *Id.* at 960. The Court further held:

Additionally, the admission of Bance's testimony that Richardson's DNA evidence matched the DNA evidence found on the gun was not in error. Richardson argues that the tests and conclusions performed by Kuriger are testimonial; therefore Bance could not testify as to these without violating the Confrontation Clause. Bance, however, testified as to her own conclusions and was subject to cross-examination. Although she did not actually perform

the tests, she had an independent responsibility to do the peer review. Her testimony concerned her independent conclusions derived from another scientist's test results and did not violate the Confrontation Clause. [*Id.* at 960.]

The Supreme Court denied certiorari in *Richardson* a month before issuing its decision in *Melendez-Diaz*. *Richardson v United States*, 556 US ___; 129 S Ct 2378; 173 L Ed 2d 1299 (2009).

In *United States v De La Cruz*, 514 F3d 121 (CA 1, 2008), the United States Court of Appeals for the First Circuit rejected a defendant's argument that his Confrontation Clause rights were violated when the chief medical examiner for the state of New Hampshire, Dr. Thomas Andrew, testified as an expert regarding the victim's cause of death. Dr. Andrew had not performed the autopsy or conducted the toxicological tests, but he relied on autopsy and toxicology reports prepared by others. *Id.* at 132-133. The court ruled that autopsy reports are not subject to Confrontation Clause rights, stating as follows:

> An autopsy report is made in the ordinary course of business by a medical examiner who is required by law to memorialize what he or she saw and did during an autopsy. An autopsy report thus involves, in principal part, a careful and contemporaneous reporting of a series of steps taken and facts found by a medical examiner during an autopsy. Such a report is, we conclude, in the nature of a business record, and business records are expressly excluded from the reach of *Crawford*. [*Id.* at 133.]

The court was "unpersuaded that a medical examiner is precluded under *Crawford* from either (1) testifying about the facts contained in an autopsy report prepared by another, or (2) expressing an opinion about the cause of death based on factual reports—particularly an autopsy report—prepared by another." *Id.* at 134. The Supreme Court denied certiorari in *De La Cruz* only

four days after it issued its opinion in *Melendez-Diaz*. *De La Cruz v United States*, 557 US ___; 129 S Ct 2858; 174 L Ed 2d 600 (2009).

Thus, at least one post-*Melendez-Diaz* case, *Avila*, 454 Mass 744, holds that statements asserting objective scientific data are testimonial statements subject to confrontation under the Sixth Amendment and, therefore, are not admissible absent an opportunity to cross-examine the witness who produced the statement. At least three post-*Melendez-Diaz* cases, including one from this Court, *Lewis (On Remand)*, 287 Mich App 356, *Johnson*, 394 Ill App 3d 1027, and *Rutterschmidt*, 176 Cal App 4th 1047, permit the introduction of such statements if they form the factual basis of a testifying expert witness's opinion. We also have two pre-*Melendez-Diaz* cases, *Richardson*, 537 F3d 951, and *De La Cruz*, 514 F3d 121, that hold that hearsay statements asserting objective scientific data are not testimonial under *Crawford*.

### IV. APPLICATION OF *MELENDEZ-DIAZ* AND ITS PROGENY

We hold that the statements here are testimonial. We would be bound by *Lewis (On Remand)*, 287 Mich App 356, under the principle of stare decisis, MCR 7.215, if *Lewis* were factually analogous. However, the Court in *Lewis* ruled that the autopsy report was nontestimonial because it was prepared pursuant to a legal duty. Here, the AIT laboratory performed the glucose tests at the request of the medical examiner, who asked for the testing to investigate the possibility that Burley died of an insulin injection. Dr. Bernardino Pacris, the medical examiner, had originally concluded that Burley died of natural causes, but he reopened the case when the police informed him of suspicious circumstances that raised the question whether defendant may have used

her insulin to end Burley's life. Dr. Pacris testified, "After talking again with the police officer, I believe there was an issue that insulin might have been given to Mr. Burley. . . . We contacted AIT laboratory. We requested tests to see if . . . it can provide us some light." He further acknowledged that he requested testing for glucose, C-peptides, and insulin because he learned about the possibility of insulin involvement in Burley's death. The medical examiner did not merely delegate to the AIT laboratory an ordinary duty imposed by law: he sought from the lab specific information to investigate the possibility of criminal activity. Under these circumstances, any statements made in relation to this investigation took on a testimonial character. Although Dr. Evans testified that toxicological testing is normally performed without any case background and without preconceived notions about what might be found, the testing here was performed in anticipation of a criminal trial, after the medical examiner's original findings had been challenged. The holdings in *Crawford* and *Melendez-Diaz* caution that, under the Confrontation Clause, defendant did not have to take Dr. Evans at his word about the test results, but instead had the right to show that "[f]orensic evidence is not uniquely immune from the risk of manipulation" or that "[a] forensic analyst responding to a request from a law enforcement official may feel pressure—or have an incentive—to alter the evidence in a manner favorable to the prosecution." *Melendez-Diaz*, 557 US at ___; 129 S Ct at 2536; 174 L Ed 2d at 326. For these reasons, the statement that Burley died with a glucose level of zero was a testimonial statement.

We further observe that in *Lewis* the cause of death was not a central issue because there was no question that the victim died from multiple stab wounds. Rather, the pivotal issue in *Lewis* was whether the defendant

was the person who inflicted the stab wounds. The autopsy findings had no relevance to the issue of the perpetrator's identity. In contrast, Burley's cause of death is the primary factual question in this case. Evidence regarding the glucose finding does not conclusively prove defendant's guilt, because questions remain about the significance of the result and there remains the possibility that the death was suicide. However, it supports the prosecution's theory that Burley died of an insulin injection.

Of the aforementioned cases, we find *Avila*, 454 Mass 744, to be the most persuasive, the most consistent with the Supreme Court's holding in *Melendez-Diaz*, and the most factually analogous to this case. The court in *Avila* held that statements in an autopsy report prepared by a nontestifying medical examiner were subject to confrontation, notwithstanding that the statements served as the facts underlying the testifying expert's opinion. Similarly, the court in *Locklear*, 363 NC 438, concluded that statements in an autopsy report and forensic dentistry report were subject to confrontation. These holdings are fully consistent with *Melendez-Diaz*. Quoting *Crawford*, 541 US at 51, the Supreme Court in *Melendez-Diaz* explained that " '*ex parte* in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or *similar pretrial statements* that declarants would reasonably expect to be used prosecutorially' " came within the " 'core class of testimonial statements' " subject to the Confrontation Clause. *Melendez-Diaz*, 557 US at ___; 129 S Ct at 2531; 174 L Ed 2d at 321 (emphasis added). The Court concluded that statements certifying the results of qualitative and quantitative analysis of the substance in question came within this class because they were functionally equivalent to live,

in-court testimony. *Id.* at ___; 129 S Ct at 2532; 174 L
Ed 2d at 321. The Court rejected the argument that the
analysts who prepared the statements were not "accu-
satory" witnesses in that they did not directly accuse
the defendant of wrongdoing. *Id.* at ___; 129 S Ct at
2533; 174 L Ed 2d at 323.

As noted, the *Melendez-Diaz* Court also rejected the
argument that "neutral scientific testing" obviated the
need for confrontation. The Court disagreed that pur-
portedly "neutral" testing was necessarily as neutral or
as reliable as the prosecution suggested, commenting
that forensic scientists are not immune from error or to
pressures to speed up their work or obtain a particular
result. *Id.* at ___; 129 S Ct at 2536-2537; 174 L Ed 2d at
325-326. The Court stated:

> This case is illustrative. The affidavits submitted by the
> analysts contained only the bare-bones statement that
> "[t]he substance was found to contain: Cocaine." At the
> time of trial, petitioner did not know what tests the
> analysts performed, whether those tests were routine, and
> whether interpreting their results required the exercise of
> judgment or the use of skills that the analysts may not have
> possessed. While we still do not know the precise tests used
> by the analysts, we are told that the laboratories use
> "methodology recommended by the Scientific Working
> Group for the Analysis of Seized Drugs." At least some of
> that methodology requires the exercise of judgment and
> presents a risk of error that might be explored on cross-
> examination. [*Id.* at ___; 129 S Ct at 2537; 174 L Ed 2d at
> 327 (citations omitted).]

And, as discussed, the Court in *Melendez-Diaz* rejected
the proposition that the certificates were business
records not subject to confrontation. The Court noted
that the certificates were more akin to police reports
because they were intended mainly for use in the
courts. *Id.* at ___; 129 S Ct at 2538; 174 L Ed 2d at 328.

Here, the laboratory technicians' finding that Burley's glucose level was zero at the time of death was the fact on which Dr. Evans based his opinion that an insulin injection was a possible cause of his death. Although the statement concerning a glucose level of zero has no independently incriminating effect, it was nonetheless an accusatory statement under *Melendez-Diaz* because it supported the prosecution's theory that defendant had killed Burley by injecting him with insulin. Although the glucose-level finding was purportedly the result of neutral scientific testing, the Court in *Melendez-Diaz* ruled that such testing is not exempt from the Confrontation Clause because of the possibility of error or bias. *Id.* at ___; 129 S Ct at 2536; 174 L Ed 2d at 326. There was no testimony concerning how such tests are conducted or whether the tests of Burley's fluid samples were conducted in accordance with testing protocols. Moreover, Dr. Evans gave no testimony to establish that he directly supervised the tests or independently verified that all testing protocols were observed.

We also hold that the technicians' statement of a zero-glucose finding comports with the factors indicating a testimonial statement as delineated in *Davis*, 547 US 813, and analyzed in *Bryant*, 483 Mich 132. Their involvement occurred only after the police advised the medical examiner that defendant was suspected of injecting Burley with insulin, prompting the medical examiner to request toxicological analysis. Burley's autopsy and the subsequent toxicological testing were not a neutral or objective investigation of an unexplained death, but a criminal investigation into whether a homicide had occurred in the past. The technicians' statements were not made contemporaneously with an ongoing emergency, but in response to an inquiry about past events. *Bryant*, 483 Mich at 141.

We are unpersuaded that the federal circuit court decisions in *Richardson*, 537 F3d 951, and *De La Cruz*, 514 F3d 121, counsel a different outcome. The courts in those cases emphasized that the autopsy reports in question only formed the factual bases for the experts' conclusions and that the experts were not acting merely as a conduit for another's opinion. Theoretically, this approach could provide a basis for distinguishing the instant case from *Melendez-Diaz*, on the ground that the certificates in *Melendez-Diaz* were a final statement sufficient in themselves to establish an element of the crime, whereas the glucose-level finding was only a factual finding that Dr. Evans determined was consistent with the prosecution's theory of the cause of death. While we recognize the distinction, we are unconvinced that classifying a statement as a fact in support of an expert's conclusion rather than the conclusion itself negates evidentiary or Confrontation Clause concerns.

Previously, we ruled that the glucose report was admissible under the hearsay exception for public records. However, the Supreme Court in *Melendez-Diaz*, 557 US at ___; 129 S Ct at 2538; 174 L Ed 2d at 328, held that the cocaine-analysis certificates were not public records or business records exempt from confrontation because they were more akin to police reports. This holding applies by analogy to the glucose report, which was obtained in response to a medical examiner's request in the course of investigating a suspicious death. Moreover, under *Crawford*, out-of-court statements are not exempt from confrontation merely because they come within a hearsay exception, including hearsay exceptions traditionally considered to be imbued with indicia of reliability.

Furthermore, this case is distinguishable from *Richardson*, 537 F3d 951, because the testifying expert in

*Richardson* had greater personal involvement in the testing process than Dr. Evans had in the glucose testing. In *Richardson*, a forensic scientist, Bance, performed a peer review, verifying that Kuriger, another scientist, conducted a thorough and proper analysis. *Id.* at 955-956. Although Dr. Evans supervised the AIT laboratory, he did not give any testimony regarding his supervision of the glucose testing.

Finally, we are unpersuaded by the holding in *Rutterschmidt*, 176 Cal App 4th 1047, that the toxicological findings were distinguishable from the certificates in *Melendez-Diaz* because the certificates were sworn affidavits made expressly for trial. The salient concern in *Melendez-Diaz* was that the prosecutor used hearsay statements in lieu of live testimony to establish a scientific fact that was key to the prosecution's case, denying the defendant the opportunity to cross-examine the persons who performed the tests and issued the certificates. The concern that this use of hearsay implicates the Confrontation Clause is not diminished when the statement is unsworn rather than sworn.

We therefore conclude that defendant's Sixth Amendment right to confront witnesses was violated when Dr. Evans was permitted to give hearsay testimony that other persons in the AIT laboratory determined that Burley's glucose level was zero at the time of his death.

### V. RELIEF

As noted, defendant failed to raise a timely objection to Dr. Evans's testimony on Confrontation Clause grounds. However, the trial in this case took place before *Melendez-Diaz* and *Crawford* were decided. The applicable test when defendant was tried, enunciated by

the Court in *Ohio v Roberts*, 448 US 56, 65; 100 S Ct 2531; 65 L Ed 2d 597 (1980), provided that out-of-court statements made by unavailable witnesses could be admitted without violating a defendant's confrontation right if there were sufficient indicia of reliability under evidentiary hearsay rules. Under these circumstances, an objection based on the Confrontation Clause would have been futile. Furthermore, at the time of trial, MRE 703 did not require, as it now does, that the facts or data "upon which an expert bases an opinion or inference shall be in evidence." Also, pre-*Crawford/Melendez-Diaz* caselaw in Michigan tended to regard autopsy reports and similar evidence as admissible hearsay exempt from the Confrontation Clause.[2] Defense counsel's failure to object can be attributed to the absence of any positive legal authority that Dr. Evans's testimony violated the Confrontation Clause. Accordingly, defendant's objection on hearsay grounds, but not under the

---

[2] Because autopsy reports could be considered public records prepared pursuant to the medical examiner's duties, MCL 52.202(1) and 52.207, they could be admitted into evidence pursuant to the hearsay exception for public records, MRE 803(8). In *People v Rode*, 196 Mich App 58, 68; 492 NW2d 483 (1992), rev'd on other grounds sub nom *People v Hana*, 447 Mich 325 (1994), this Court held that the chief medical examiner permissibly testified with regard to the observations recorded in a report prepared by a subordinate medical examiner. Conversely, in *People v Shipp*, 175 Mich App 332, 338-339; 437 NW2d 385 (1989), this Court held that "conclusions and opinions contained in an autopsy report are not admissible under MRE 803(6)." The Court in *Rode*, 196 Mich App at 68, distinguished *Shipp* on the ground that the hearsay statements from the report were limited to the medical examiner's observations. A toxicologist's determination of a decedent's glucose level is more in the nature of a factual observation than a conclusion or opinion: it is objective numerical data obtained from standardized testing rather than a subjective judgment derived from personal observations or professional evaluation. In this pre-*Crawford*, pre-*Melendez-Diaz* view of autopsy reports and similar evidence, defense counsel had insufficient cause to believe that an objection on Confrontation Clause grounds would have been anything but futile.

Confrontation Clause, was reasonable in light of the state of the law at the time of her trial.

Fundamental fairness requires that this issue be reviewed as though it were fully preserved. See *People v Shirk*, 383 Mich 180, 196; 174 NW2d 772 (1970); *People v Townsend*, 25 Mich App 357, 361-362; 181 NW2d 630 (1970); see also *Lonsby*, 268 Mich App at 394-395.[3] We review preserved issues of constitutional error to determine whether they are harmless beyond a reasonable doubt. "A constitutional error is harmless if '[it is] clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error.' " *People v Mass*, 464 Mich 615, 640 n 29; 628 NW2d 540

---

[3] We recognize that, in our prior opinion, we reviewed defendant's Confrontation Clause claim as an unpreserved constitutional error. However, because our Supreme Court vacated that part of the opinion, we are not bound by that standard of review. See Black's Law Dictionary (7th ed), p 1546 (stating that the meaning of "vacate" is "[t]o nullify or cancel; make void; invalidate"). We further observe that, in *Bryant*, 483 Mich at 151-152, our Supreme Court treated a similar claim as an unpreserved constitutional error. However, the Court did not specifically rule that the plain-error rule applies to all cases in which controlling authority postdates the trial and a timely objection would have been pointless because of the state of the law at the time of trial. Indeed, the Court in *Bryant* prefaced its discussion with the phrase "[e]ven assuming that the error here is unpreserved" and later noted that caselaw at the time of the defendant's trial made it "completely reasonable" that the defendant did not offer an objection pursuant to the Confrontation Clause. *Id.* at 151 & n 17. The *Bryant* Court further opined that, because *Crawford* was not decided until after the trial, the "defendant cannot be faulted for failing to raise the Confrontation Clause issue at the trial." *Id.* at 151 n 17. Our reading of *Bryant* indicates that the Court reviewed the issue under the plain-error rule merely to show that the defendant was entitled to relief even if he had to meet the higher standard of showing prejudicial error. However, we hold that under the circumstances of this case, and because there was a clear violation of *Melendez-Diaz*, defendant is not required to show her actual innocence or that the error seriously affected the fairness, integrity, or public reputation of judicial proceedings. Rather, as noted, this issue merits review as though the issue had been preserved under the standard of harmless beyond a reasonable doubt.

(2001), quoting *Neder v United States*, 527 US 1, 18; 119 S Ct 1827; 144 L Ed 2d 35 (1999). In other words, if it is beyond a reasonable doubt that the jury would have convicted defendant on the basis of untainted evidence, defendant is not entitled to a new trial.

The trial court specifically ruled, "I find that [Burley] really died from having a zero glucose level." This wording suggests that the trial court considered the zero-glucose finding in its holding. However, as our Supreme Court observed in *Dendel*, 481 Mich 114, ample other evidence supported defendant's conviction. Defendant argues that Dr. Evans should not have been allowed to testify about the finding of no glucose in Burley's system after he died. But Dr. Pacris testified before Dr. Evans, and he also noted that there was a lack of glucose in Burley's bodily fluids. As our Supreme Court stated, "Dr. Pacris explained that, although the glucose levels in a person's bodily fluids drop immediately after the person dies, the complete lack of glucose in Burley's vitreous fluids was consistent with a finding that Burley had been injected with insulin." *Id.* at 126. We further note that Dr. Pacris repeatedly attached little importance to a failure to find glucose in Burley's blood after he died because "glucose drops instantly once we die." Moreover, Dr. Pacris testified that Burley died of hypoglycemic shock, and he did not base his conclusion on the toxicological data. As our Supreme Court noted:

> [Dr. Pacris] found acute tubular necrosis in the kidneys and dead cells in the proximal tubules of the brain, which are usually seen in people who have suffered hypoglycemic shock. Dr. Pacris ultimately concluded that the cause of death was complications from hypoglycemia, which can be caused by an insulin injection. *In reaching this conclusion, he relied more on his anatomical findings and the circumstances surrounding the death rather than on the toxico-*

*logical findings.* Specifically, he relied on microscopic hypoxic changes in Burley's brain in concluding that Burley must have been comatose for at least 12 hours before he died at 4:00 p.m. on April 2, 2002. He testified that hypoxic changes to the brain, including red neurons on the hippocampus, are only manifested if the person has been comatose for about 12 hours. [*Id.* at 126-127 (emphasis added).]

In her dissent, Justice KELLY agreed that "[t]he process by which Dr. Pacris determined the cause of death was founded on an anatomical basis and the circumstances surrounding the death rather than on toxicological findings." *Id.* at 142 (KELLY, J., dissenting).

As our Supreme Court also observed, defense counsel took the position at trial that "Burley had died either by injecting himself with insulin or from the side effects of numerous medications prescribed for him." *Id.* at 121 (majority opinion). The importance of the zero-glucose finding is severely undermined by this defense, which accepts the fact that Burley may have taken insulin and merely avers that Burley injected it into himself. The Supreme Court further stated in the opinion:

> After defendant's arrest, she told police detectives that Burley had injected himself with insulin. During a later interview with a police detective, defendant said, "That poor dear, he killed himself for me." She told the detective that despite Burley's severely impaired vision and problems with holding things, he could inject himself with insulin. Defendant also told defense counsel that Burley had killed himself by an insulin injection and that she wanted him to pursue this theory of defense at trial. Defendant also testified that Burley had mental problems and that he had "talked suicide for 10, 15 years." She had informed two of Burley's doctors of his suicidal intentions. [*Id.* at 120-121.]

It makes little difference that the fact-finder heard inadmissible testimony that Burley's fluids showed a

lack of glucose, which would suggest that insulin was introduced into his system, in light of evidence that defendant believed Burley could have taken insulin.

Moreover, evidence other than the scientific findings played a significant role in defendant's conviction:

> [S]trong circumstantial evidence supported the theory that defendant had given Burley an insulin injection.
>
> Burley was difficult to care for because of his multiple health problems, which included dementia. Defendant was under a great deal of stress as Burley's sole caregiver. Frustrated by Burley's demands, defendant had considered giving him a shot of insulin, which she knew could be lethal and would be difficult to detect in a deceased person. When her caregiving situation became worse, defendant unsuccessfully attempted to obtain assistance in caring for Burley from several sources. Less than 24 hours before Burley's death, defendant became "quite tearful and upset" when the nurse assisting defendant terminated her services because Burley had been uncooperative. Defendant admitted that she was at her "wit's end" in the middle of that night when the police declined to take Burley away after he caused a disturbance. In light of the facts leading up to Burley's death, the trier of fact could reasonably conclude that this nighttime incident caused defendant to finally snap and follow through with her idea to inject Burley with insulin. This finding would be consistent with Dr. Pacris's testimony that hypoxic changes in Burley's brain indicated that he had fallen into a coma from insulin-induced hypoglycemic shock at about 4:00 a.m., shortly after the police left.
>
> The trier of fact could also infer that defendant's actions after Burley's death demonstrated her guilty state of mind and her attempt to cover up the crime. Defendant testified that when she suspected that Burley might be dead, she did not contact 911, but instead called a friend to come over. Defendant lied to Burley's family about his condition and hid his death from the only persons who might have questioned the cause of death and recalled her threat to

inject him with insulin. Moreover, defendant managed to have Burley's body cremated before Burley's family could question the cause of death. She had also wanted Burley's body cremated without an autopsy being performed, but was unable to prevent the autopsy. This circumstantial evidence regarding defendant's state of mind further supports the prosecution's theory that defendant murdered Burley. [*Id.* at 132-134.]

In light of Dr. Pacris's testimony, defendant's position at trial, and the circumstantial evidence surrounding Burley's death, we hold that it is clear beyond a reasonable doubt that a reasonable jury would have convicted defendant absent the inadmissible evidence regarding the toxicological results. Accordingly, the Confrontation Clause error was harmless beyond a reasonable doubt, and defendant is not entitled to a new trial.

Affirmed.

BORRELLO, P.J., concurred.

WILDER, J. (*concurring*). I concur in the result reached by the majority. I write separately to address the majority's conclusion that defendant's failure to object, on Confrontation Clause grounds, to the testimony of Dr. Michael Evans, founder, president, chief executive officer, and director of operations at AIT Laboratories,[1] was reasonable given the then existing state of the law and that, therefore, fundamental fairness requires that we treat this issue as though it had been properly preserved.

"Due process requires fundamental fairness, which is determined in a particular situation first by 'considering any relevant precedents and then by assessing the several interests that are at stake.' " *In re Brock*, 442 Mich 101, 111; 499 NW2d 752 (1993), quoting *Lassiter*

---

[1] In this regard, Dr. Evans was more than a mere toxicologist at AIT.

*v Dep't of Social Servs*, 452 US 18, 25; 101 S Ct 2153; 68
L Ed 2d 640 (1981); see the observation in 16B Am Jur
2d, Constitutional Law, § 948, pp 448-449 ("That which
may, in one setting, constitute a denial of fundamental
fairness, shocking to the universal sense of justice, and
thus violative of due process may, in other circum-
stances and in the light of other considerations, fall
short of such denial."). "This Court has said that due
process considerations include not only (1) the nature of
the private interest at stake, but also (2) the value of the
additional safeguard, and (3) the adverse impact of the
requirement upon the Government's interests." *United
States v Ruiz*, 536 US 622, 631; 122 S Ct 2450; 153 L Ed
2d 586 (2002).

The majority first concludes that under *Melendez-
Diaz v Massachusetts*, 557 US ___; 129 S Ct 2527; 174 L
Ed 2d 314 (2009), the statements concerning the toxi-
cological testing performed at AIT Laboratories and, in
particular, the glucose levels obtained as a result of the
testing, were testimonial in nature and that, therefore,
Dr. Evan's testimony concerning the testing violated
defendant's Sixth Amendment right to confront wit-
nesses. I agree. The majority then concludes that "fun-
damental fairness" requires retroactive application of
the rights of confrontation provided by the Confronta-
tion Clause as a remedy for the violation, so that
defendant's posttrial objection to the offending state-
ments on Confrontation Clause grounds must be
treated as having been made at trial and preserved,
even though it actually was not.

I respectfully disagree that fundamental fairness
requires imposition of the legal fiction proposed by the
majority.

First, although defendant certainly has an interest in
confronting the incriminating statements against her,

there is little probative value to defendant in treating the Confrontation Clause objection as preserved, even though it actually was not, because there was more than sufficient other evidence, to which no credible challenge has been made, in support of the trial court's finding that defendant was guilty of second-degree murder, MCL 750.317, beyond a reasonable doubt. In other words, treating the admission of the statements as something other than plain error, as we did in our previous opinion,[2] makes no demonstrable difference insofar as the outcome of the case is concerned.

Second, the interests of the people of the state of Michigan[3] are impaired by limiting, through a legal fiction, the consideration of evidence that the prosecution might have been able to "properly" introduce by other means had it been placed on notice to consider doing so with a contemporaneously raised objection.[4] In this regard, like the prosecutor (as well as the defense counsel and the circuit judge) so eloquently defended by Justice BLACK in his concurring opinion in *People v Shirk*, 383 Mich 180, 198-200; 174 NW2d 772 (1970), the prosecutor in the instant case was a vigorous advocate, within the rules as they then existed, in seeking and obtaining defendant's conviction of second-

---

[2] *People v Dendel (On Remand)*, unpublished opinion per curiam of the Court of Appeals, issued September 11, 2008 (Docket No. 247391).

[3] These interests are not expressly acknowledged by the majority in its fundamental-fairness analysis.

[4] The Supreme Court has observed:

"It is the duty of the public prosecutor to see that the person charged with crime receives a fair trial, so far as it is in his power to afford him one, and it is likewise his duty to use his best endeavor to convict persons guilty of crime; and in the discharge of this duty an active zeal is commendable, yet his methods to procure conviction must be such as accord with the fair and impartial administration of justice . . . ." [*People v Bahoda*, 448 Mich 261, 266 n 6; 531 NW2d 659 (1995), quoting *People v Dane*, 59 Mich 550, 552; 26 NW 781 (1886).]

degree murder. In my judgment, it would not accord with due process, on the facts of this particular case, to retroactively apply a Confrontation Clause analysis to the laboratory evidence as though proper, contemporaneous objections had been made.

I join the majority in affirming, but I would leave to another day the question regarding under what circumstances fundamental fairness requires the retroactive application of *Melendez-Diaz v Massachusetts*. I respectfully submit that this is not that case.