*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

UNPUBLISHED
July 1, 2021

v

CAMERON DAVON WRIGHT,

        Defendant-Appellant.

No. 348251
Kent Circuit Court
LC No. 18-006740-FC

Before: MURRAY, C.J., and FORT HOOD and GLEICHER, JJ.

PER CURIAM.

A jury convicted Cameron David Wright of first-degree murder, MCL 750.316; possession of a firearm during the commission of a felony (felony-firearm), second offense, MCL 750.227b; and felon in possession of a firearm (felon-in-possession), MCL 750.224f, for the 2018 murder of Curtis Swift, a witness to Wright's 2013 murder of Andre Davis. Wright raises several challenges to his convictions, none of which warrant relief. We affirm.

## I. BACKGROUND

In 2013, Andre Davis was shot and killed during a drive-by shooting. Wright was questioned during the initial investigation, but the police reached a dead end. In 2017, the Grand Rapids Police Department launched a new investigation and began to narrow in on Wright as the primary suspect. In January 2018, detectives issued investigative subpoenas to several witnesses. Wright was well aware of these facts.

Wright knew that Javon Turley had testified pursuant to an investigative subpoena. When Wright was interviewed about Davis's murder in 2013, he stated that he was at the apartment of his girlfriend, Kiara Adams, at the time of Davis's murder and that Turley had driven him there. In January 2018, Wright asked Adams to tell the police that Turley had dropped him off at her apartment in the early morning hours of August 25, 2013. Wright also knew that Eduardo Welford and Tyrice Morris had testified pursuant to investigative subpoenas. At trial, Welford and Morris testified that they were in a vehicle with Wright and Curtis Swift when Wright shot a gun into the vehicle carrying Davis. On January 16, 2018, Wright used an intermediary to contact Welford while he was on a work release jail program. Morris originally told police he knew nothing about

Davis's shooting. However, after Swift was found dead, Morris returned to the police station and identified Wright as Davis's shooter.

Officers did not locate Swift in time to issue an investigative subpoena. On January 19, 2018, Swift was found dead in his house. Swift's two cell phones were missing, but nothing else was stolen. In fact, Swift had a substantial amount of cash in his pocket.

On January 17, Swift told Jaimaelah Stokes, the mother of one of his children, that he needed to talk to "Cam"—defendant Cameron David Wright—and get him to admit that he shot Davis. Swift told Stokes that he was in the car when the shooting happened and that another person in the car had already "snitch[ed]." Stokes last saw Swift at around 8:30 p.m. on January 17. She tried to text him after, but Swift did not respond.

Bao Nguyen testified that he telephoned Swift at around 8:40 p.m. on January 17, and then went to Swift's home. Swift was home alone and sold Nguyen drugs. Swift appeared "a little nervous" and was "acting funny." Swift told Nguyen that his "cuz" was coming over. When Nguyen left, he loitered outside his vehicle for a short time. He saw Wright walk up the street toward Swift's house. No one else was in the area. Nguyen texted Swift a couple of hours later and called him eight times the following day. Swift did not respond to the text or answer the calls. Nguyen solicited a mutual friend to call Swift. Swift did not answer that call either.

Swift did not attend his daughter's birthday party on January 18, and did not answer calls from Stokes or his daughter's mother, Elisha Holloway. At the time of his death, Swift was dating Carlasia Wells. In the days leading up to his death, Wells overheard Swift on a call telling someone that he did not "have anything to do with that" and to quit calling his phone. Swift told Wells that the call came from "Cam and them." Wells described that Swift seemed paranoid during that period. The last time she heard from Swift was 6:18 p.m. on January 17. She went to Swift's home at 9:30 p.m. on January 18, but Swift did not answer the door.

Glen Johnson testified that he contacted Wright on the evening of January 17 to purchase drugs from him. Johnson described Wright as a dependable dealer who always came when called. On the evening of January 17, however, Wright kept pushing back his meeting time with Johnson. After promising to arrive by 9:40 p.m., Wright did not come until 11:19.

We note that Wright was convicted of murdering Davis in a separate action. We affirm that conviction in Docket No. 348250, which is being considered contemporaneously with this appeal. The jury in the current matter also convicted Wright of Swift's murder and connected firearm offenses. Wright raises several challenges in this matter on appeal.

## I. REQUEST TO REHEAR TESTIMONY

Wright argues that the trial court erroneously denied the jury's request to rehear the testimonies of Nguyen, Stokes, and Jeremy Hairston (who was present when Swift's body was discovered). The trial court received the jury's note and instructed the jurors to continue their deliberations using their notes and collective memories. However, the court advised the jury, "If you absolutely need to hear the testimony," the jury could ask again later. The court then asked the attorneys if there were any objections to its response. Both the prosecutor and defense counsel stated, "No, Your Honor." By expressly approving the court's response, Wright waived any

objection. And the waiver extinguished any error. See *People v Kowalski*, 489 Mich 488, 503-505; 803 NW2d 200 (2011).

## II. SUFFICIENCY OF THE EVIDENCE

Wright contends that the prosecutor presented insufficient evidence to support that he was the person who killed Swift. We review de novo challenges to the sufficiency of the evidence, viewing the evidence in the light most favorable to the prosecution to determine whether any rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt. *People v Cline*, 276 Mich App 634, 642; 741 NW2d 563 (2007).

The jury was instructed that it could find Wright guilty of first-degree murder either as the principal or under an aiding-and-abetting theory. Specifically, the prosecutor argued that Wright either shot Swift or encouraged Derrick Banks in committing the murder.[1]

"[I]dentity is an element of every offense." *People v Yost*, 278 Mich App 341, 356; 749 NW2d 753 (2008). The evidence that Wright was the person who murdered Swift or assisted the person who murdered Swift was circumstantial. There was no eyewitness to the murder. But the elements of the offense may be established by circumstantial evidence and reasonable inferences drawn therefrom. *People v Dunigan*, 299 Mich App 579, 582; 831 NW2d 243 (2013).

There was substantial evidence that Wright had motive to kill Swift to prevent him from testifying that Wright killed Davis. Although motive is not an essential element of a crime, it is a relevant piece of circumstantial evidence. *People v Unger*, 278 Mich App 210, 223; 749 NW2d 272 (2008). Several witnesses placed Swift in the car with Wright at the time of Davis's murder. Several witnesses testified that Wright attempted to stop them from identifying him as the shooter. And several described Swift as nervous and paranoid in the days leading up to his murder. Swift specifically told Wells that defendant was pressuring him.

There was also substantial evidence that Wright was at Swift's house at the time of the murder. Stokes testified that on the morning of January 17, 2018, Swift told her that he wanted to talk to Wright and convince him to turn himself in. Nguyen was at Swift's house on the evening of January 17. Swift told Nguyen that his "cuz" was coming over. Nguyen saw Wright walking toward Swift's house as Nguyen loitered outside his car before leaving. At 9:39 p.m. on the night of Swift's murder, Wright sent a text message to Banks, telling him to "[c]ome in now." Cell phone data revealed that between 8:53 p.m. and 9:41 p.m. both Wright's and Banks's cell phones were in the vicinity of Swift's home. And Wright delayed a meeting with Johnson on the night of January 17 until 11:19 p.m., giving him time to commit the offense.

Additionally, there was substantial evidence that Swift died soon after Nguyen left his house, around the time of Wright's arrival. Various witnesses texted or called Swift beginning at 9:00 p.m. on January 17, with no response. The last outbound activity from either of Swift's cell phones was at 8:29 p.m. on January 17. Swift last spoke on a phone at 9:06 p.m. Swift's body

---

[1] Banks was presented as a witness at Wright's trial, but he invoked his Fifth Amendment right against self-incrimination.

was found at about 12:00 p.m. on January 19, and the medical examiner opined that he had been dead for one to two days.

We must draw all reasonable inferences and make all credibility choices in favor of the jury's verdict. *People v Nowack*, 462 Mich 392, 400; 614 NW2d 78 (2000). The evidence supported that Wright either personally shot Swift shortly after 9:00 p.m. on January 17, 2018, or had Derrick Banks shoot Swift on his behalf. Viewing the evidence in the light most favorable to the prosecution, we have no ground to interfere with the jury's verdict.

## III. SELF-INCRIMINATION

Wright next argues that his right against self-incrimination was violated when, after he was arrested for Davis's murder, he was told by the interrogating officer that he could not refuse to provide the passcode for his cell phone and that his parole would be revoked if he refused. Wright sought suppression of this evidence before trial, and the court denied the motion without holding a hearing. Generally, we review for clear error a court's factual findings at a suppression hearing and review de novo the court's ultimate ruling. *People v Maggitt*, 319 Mich App 675, 681-682; 903 NW2d 868 (2017).

As a condition of his parole for an earlier offense, Wright agreed to the following condition: "I voluntarily consent to a search of my person and property upon demand by a peace officer or parole officer. If I do not sign this written consent, I understand that my parole may be rescinded or revoked." He also agreed: "You must comply with special conditions imposed by the Parole and Commutation Board and with written or verbal orders made by the field agent."

Wright was arrested for Davis's murder on January 19, 2018. In the house where Wright was arrested, officers found a cell phone that belonged to him. Once in custody, the interrogating police officer presented the phone to Wright. The officer asked for the phone's passcode so "they could search the phone contents." When Wright refused, the police told him that "he had to since he was on parole" and that "as a parolee he was required to give them the information." As a result, Wright gave the interrogating officer his passcode, and the officers opened and searched the contents of his phone.

The trial court denied Wright's motion for an evidentiary hearing and to suppress for the reasons it denied the same motion in the murder trial underlying Docket No. 348250. In that case, the court stated, "[T]he defendant was on parole, had signed releases and agreed to be searched. And not only him, but his possessions. I find no reason to exclude this information from trial."[2]

"The Fifth Amendment of the United States Constitution guarantees that the government cannot compel a defendant in a criminal case to testify against himself. . . . In addition, art 1, § 17 of the Michigan Constitution affords defendants a corresponding state constitutional right to be free from compelled self-incrimination." *People v Cheatham*, 453 Mich 1, 9; 551 NW2d 355 (1996). This right extends to custodial interviews, not just trial, and is protected by reading a

---

[2] Despite that Wright made the same motion in Docket No. 348250, he did not challenge the court's order in that case.

suspect his rights pursuant to *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966). *People v Elliott*, 494 Mich 292, 301; 833 NW2d 284 (2013). A person does not lose his protection against self-incrimination "by reason of his conviction of a crime; notwithstanding that a defendant is imprisoned or on probation at the time he makes incriminating statements, if those statements are compelled they are inadmissible in a subsequent trial for a crime other than that for which he has been convicted." *Minnesota v Murphy*, 465 US 420, 426; 104 S Ct 1136; 79 L Ed 2d 409 (1984). "An individual must show three things to fall within the ambit of the Fifth Amendment: (1) compulsion, (2) a testimonial communication or act, and (3) incrimination." *In re Grand Jury Subpoena Duces Tecum*, 670 F3d 1335, 1341 (CA 11, 2012).

Parolees and probationers have a duty to appear and to truthfully answer questions posed by their probation or parole officer. "[T]he general obligation to appear and answer questions truthfully [does] not in itself convert . . . otherwise voluntary statements into compelled ones." *Murphy*, 465 US at 427.

> The threat of punishment for reliance on the privilege distinguishes cases of this sort from the ordinary case in which a witness is merely required to appear and give testimony. A State may require a probationer to appear and discuss matters that affect his probationary status; such a requirement, without more, does not give rise to a self-executing privilege. The result may be different if the questions put to the probationer, however relevant to his probationary status, call for answers that would incriminate him *in a pending or later criminal prosecution*. There is thus a substantial basis in our cases for concluding that if the State, either expressly or by implication, asserts that invocation of the privilege would lead to revocation of probation, it would have created the classic penalty situation, the failure to assert the privilege would be excused, and the probationer's answers would be deemed compelled and inadmissible in a criminal prosecution. [*Id*. at 435-436 (emphasis added).]

The defendant in *Murphy* was questioned about an earlier, uncharged offense while at his monthly meeting with his probation officer. Wright, on the other hand, was brought in for questioning by police officers for the 2013 murder of Davis and threatened with revocation of parole for a completely unrelated offense unless he provided the passcode for his cell phone. In *United States v Sanchez*, 334 F Supp 3d 1284 (ND Ga, 2018), a lower federal court faced this same scenario. In that case, the defendant was arrested and interrogated by law enforcement officers. He only turned over the passcodes to his cell phones "after he repeatedly refused to do so" and was threatened with arrest for a parole violation. *Id*. at 1294. The district court conceded that the officers could charge the defendant with violating parole for failing to turn over the passcodes given the conditions of his parole. *Id*. at 1295.

But, the court determined, use of evidence gathered from the compelled production of the defendant's cell phone passcodes violated the defendant's Fifth Amendment right against self-incrimination and therefore could not be used against him at trial. *Id*. First, the court cited caselaw supporting "that production of cellphone passwords constitutes incriminatory testimony protected by the Fifth Amendment." *Id*. Second, the court compared the facts to those in *Murphy* and several lower court cases, and found a compelling case of compulsion. The defendant in *Sanchez* "twice refused to provide the iPhone passcodes" and the interrogating officer expressly "warned him that

his refusal to do so could result in his arrest for a parole violation." *Id*. at 1297. This was "the classic 'penalty situation.' " *Id*. at 1298.

According to Wright, he was interrogated by a parole agent and members of the Grand Rapids Police Department for more than four hours. During the interrogation, Wright allegedly repeatedly refused to provide the passcode for his cell phone. He only disclosed the code when his parole agent told him that if he refused, he would be violated.

However, the prosecutor advised the court that Wright was not just arrested for Davis's murder; he was also arrested for violating the conditions of his parole. Wright had already been "violated" before anyone asked him for the code to his cell phone. After Wright was placed in an interrogation room, the parole agent took the cell phone in and asked Wright for the passcode, reminding "him of the conditions of his parole, including allowing warrantless searches of his person and/or property." Wright provided the passcode, which the parole agent wrote on a piece of paper. The paper was given to the Grand Rapids Police Department. Detectives then came into the interrogation room, read Wright his *Miranda* rights and Wright invoked his right to remain silent.

Wright was under arrest and in custody when he was ordered to turn over his cell phone passcode. Even if he was under arrest for some other violation of his parole conditions, the prosecutor could add to that list if Wright failed to provide his passcode. Accordingly, Wright was compelled to turn over his passcode to avoid penalty. This was compelled self-incrimination.

However, given the other evidence against Wright, the admission of the cell phone evidence was harmless. From Wright's cell phone information, the prosecutor argued that Wright deleted incriminating text communications with Swift. Wright's message to Banks "to come in" was also presented from the phone. Although this evidence was damaging, it was not necessary to sustain Wright's convictions. Nguyen and cell tower data placed Wright at Swift's home around the time of the murder. And there was significant evidence that Wright was pressuring and intimidating Swift and the other witnesses against him, even without evidence that Wright deleted messages from his phone to hide their contents. Accordingly, any error ultimately was harmless and Wright is not entitled to relief.

## IV. FORFEITURE BY WRONGDOING

Wright challenges the trial court's admission of Stokes's and Wells's testimonies about Swift's out-of-court statements suggesting that Wright was pressuring Swift not to implicate him in Davis's shooting and that Swift was afraid. We review for an abuse of discretion a trial court's decision to admit evidence. *People v Lukity*, 460 Mich 484, 488; 596 NW2d 607 (1999). An abuse of discretion occurs when the trial court's decision falls outside the range of principled outcomes. *People v March*, 499 Mich 389, 397; 886 NW2d 396 (2016). We review de novo whether the admission of evidence would violate a defendant's Sixth Amendment right of confrontation. *People v Nunley*, 491 Mich 686, 696-697; 821 NW2d 642 (2012).

"[T]he Sixth Amendment bars the admission of testimonial statements by a witness who does not appear at trial unless the witness is unavailable and the defendant had a prior opportunity to cross-examine the witness." *People v Dendel (On Second Remand)*, 289 Mich App 445, 453;

797 NW2d 645 (2010). When a defendant causes the absence of the witness, the defendant may forfeit his right to confront the witness and to challenge the admission of the statements on hearsay grounds. For the forfeiture-by-wrongdoing doctrine to apply, the defendant must have specifically intended that his wrongdoing would render the witness unavailable to testify. *People v Burns*, 494 Mich 104, 111, 113; 832 NW2d 738 (2013).

Under MRE 804(b)(6), if the declarant is unavailable, "[a] statement offered against a party that has engaged in or encouraged wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness" is not excluded by the hearsay rule. To admit an out-of-court statement under MRE 804(b)(6), the prosecutor must show by a preponderance of the evidence that "(1) the defendant engaged in or encouraged wrongdoing; (2) the wrongdoing was intended to procure the declarant's unavailability; and (3) the wrongdoing did procure the unavailability." *Burns*, 494 Mich at 115.

As discussed, significant evidence was presented that Wright killed Swift to prevent Swift from implicating him in Davis's murder. If the evidence could establish this fact beyond a reasonable doubt, the lesser burden of proof for the admission of this evidence naturally was also established. Accordingly, the admission of Swift's statements to Stokes and Wells neither violated the hearsay rules nor Wright's right to confront the witnesses against him.

## V. FORMER TESTIMONY

Wright next argues that the trial court erred in admitting into this trial Adams's testimony from his preliminary examination in the matter underlying Docket No. 348250. We review the trial court's evidentiary ruling for an abuse of discretion. *Lukity*, 460 Mich at 488. We also review for an abuse of discretion a trial court's determination that the prosecutor employed due diligence. *People v Eccles*, 260 Mich App 379, 389; 677 NW2d 76 (2004). And we review de novo whether the admission of this evidence violated Wright's Sixth Amendment right of confrontation. *Nunley*, 491 Mich at 696-697.[3]

MRE 804(b)(1) creates a hearsay exception, when the declarant is unavailable, for "[t]estimony given as a witness at another hearing of the same or a different proceeding, if the party against whom the testimony is now offered . . . had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination." A declarant is unavailable when the declarant "is absent from the hearing and the proponent of a statement has been unable to procure the declarant's attendance . . . by process or other reasonable means, and in a criminal case, due diligence is shown." MRE 804(a)(5). Due diligence requires a reasonable, good-faith effort to find the declarant. *People v Bean*, 457 Mich 677, 684; 580 NW2d 390 (1998). "[D]ue

---

[3] We note that Wright also raised these challenges in Docket No. 348250. At that trial, defense counsel and the prosecutor discussed the issue before trial and defense counsel expressly approved of the court's decision. No such discussion occurred in this case and counsel did not waive any claim of error.

diligence is the attempt to do everything reasonable, not everything possible, to obtain the presence of the witness." *Eccles*, 260 Mich App at 391.

The prosecutor diligently sought Adams to present her live testimony. The trial court relied on the prosecutor's efforts to locate Adams before both the current trial and Wright's trial for the murder of Davis.[4] The prosecutor knew that Adams had moved to Georgia, and she enlisted "Victim Witness" and law enforcement officials in both Michigan and Georgia to locate Adams. Those attempts were unsuccessful. Through a random twist of fate, a potential juror in the Davis murder trial knew Adams and gave the court Adams's phone number. The court entered an order to "ping" the phone. Even though the phone pinged in an apartment complex in Georgia, Georgia law enforcement officials were still unable to locate Adams. The record supported that the prosecutor diligently searched for Adams to no avail, making her a legally unavailable witness.

Further, Wright had an opportunity to cross-examine Adams at the preliminary examination and had a similar motive to develop her testimony. Wright complains that as he was not yet arrested for Swift's murder at the time of his preliminary examination in the Davis murder case, he did not have a similar motive to develop Adams's testimony. Generally, "[w]hether a party had a similar motive to develop the testimony depends on the similarity of the issues for which the testimony is presented at each proceeding." *People v Farquharson*, 274 Mich App 268, 275; 731 NW2d 797 (2007). In assessing whether the defendant had a similar motive to develop the witness's testimony at the prior proceeding, the court must consider: "(1) whether the party opposing the testimony had . . . an interest of substantially similar intensity to prove (or disprove) the same side of a substantially similar issue; (2) the nature of the two proceedings—both what is at stake and the applicable burdens of proof; and (3) whether the party opposing the testimony in fact undertook to cross-examine the witness. . . ." *Id*. at 278 (cleaned up).

The purpose of a preliminary examination "is to determine if a crime has been committed and, if so, if there is probable cause to believe the defendant committed it." *People v Johnson*, 427 Mich 98, 104; 398 NW2d 219 (1986) (cleaned up). The probable-cause standard is "less rigorous" than the beyond-a-reasonable-doubt standard used at trial. *People v Yost*, 468 Mich 122, 126; 659 NW2d 604 (2003). At Wright's preliminary examination in the Davis murder case, the prosecution had to prove that Davis was murdered and that there was probable cause to believe that Wright murdered him. The prosecution presented the testimony of Adams at the preliminary examination to help establish probable cause that Wright murdered Davis.

The prosecutor's theory in the present case was that Wright killed Davis in 2013 and killed Swift because he was an eyewitness to Davis's murder. At the current trial, the prosecutor had to prove not only that defendant killed Swift, but that he also killed Davis. The prosecutor used Adams's preliminary examination testimony for this purpose. In other words, Adams's preliminary examination testimony was used in the present case for the same purpose for which it was elicited in the other criminal matter. Accordingly, Wright's interest in challenging Adams at the Davis murder preliminary examination was just as strong as it would have been in the current

---

[4] We take judicial notice of the prosecutor's statements to the trial court in the Davis case regarding what efforts were used to locate Adams before trial in that case. See MRE 201(b).

-8-

case. Defense counsel chose not to cross-examine Adams, but actual cross-examination is not required, only an opportunity to do so.

Furthermore, admission of Adams's preliminary examination testimony did not violate Wright's right to confront the witnesses against him. The Confrontation Clause prohibits "the admission of testimonial statements by a witness who does not appear at trial unless the witness is unavailable and the defendant had a prior opportunity to cross-examine the witness." *Dendel (On Second Remand)*, 289 Mich App at 453. Testimony given at a preliminary examination is a testimonial statement. *Crawford v Washington*, 541 US 36, 68; 124 S Ct 1354; 158 L Ed 2d 177 (2004). Although Wright did not cross-examine Adams at the preliminary examination, he had the opportunity to do so, which is all that the Confrontation Clause requires. "The Confrontation Clause guarantees only an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *United States v Owens*, 484 US 554, 559; 108 S Ct 838; 98 L Ed 2d 951 (1988) (cleaned up).

## VI. REASONABLE DOUBT SUPPLEMENTAL INSTRUCTION

Wright next challenges the trial court's supplemental instruction on reasonable doubt at the beginning of jury selection. Wright failed to raise a contemporaneous objection and our review is therefore limited to plain error affecting defendant's substantial rights. *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999).

"A criminal defendant is entitled to have a properly instructed jury consider the evidence against him." *People v Riddle*, 467 Mich 116, 124; 649 NW2d 30 (2002). The easiest way to achieve this, in most cases, is to read the jury the applicable model jury instructions. Indeed, MCR 2.512(D)(2) requires courts to give standard instructions when applicable. However, courts may give additional tailored instructions even on basic concepts that are accurately described in the instructions. This was such a case. The court read the standard definition of reasonable doubt to the jury during voir dire. No further elucidation was necessary, but the court continued anyway. Yet, Wright was not harmed as the instructions, taken as a whole, correctly conveyed the meaning of the burden of proof. See *Victor v Nebraska*, 511 US 1, 5; 114 S Ct 1239; 127 L Ed 2d 583 (1994).

The trial court added that proof beyond a reasonable doubt does not require "100 percent" proof of a defendant's guilt. This was a legally correct statement. See *People v Bowman*, 254 Mich App 142, 148-151; 656 NW2d 835 (2002); see also *Victor*, 511 US at 13 (stating that "absolute certainty is unattainable in matters relating to human affairs"). Although the trial court informed the venire members that a jury can base its verdict on the testimony of one witness, it emphasized that the testimony of the witness must convince the jury of the defendant's guilt beyond a reasonable doubt. We disagree with Wright that this part of the supplemental instruction was "custom tailored" for his case. The two examples that the trial court gave when one witness's testimony may provide proof of a defendant's guilt beyond a reasonable doubt—an armed robbery of a gas station and criminal sexual conduct in a basement—were significantly different than the facts of the present case. Additionally, although only Nguyen saw Wright near Swift's house on January 17, 2018, Nguyen did not testify that he saw Wright kill Swift. Unlike the examples given by the court, there was no direct evidence of Wright's guilt. All the evidence of Wright's guilt was circumstantial.

Wright further contends that defense counsel was ineffective for failing to object to the instruction. As the instruction was not erroneous, counsel had no ground to object. Counsel cannot be deemed ineffective for failing to raise a meritless objection. *People v Uphaus (On Remand)*, 278 Mich App 174, 185; 748 NW2d 899 (2008).

## VII. JUDICIAL BIAS

Wright contends that the trial judge was biased against him and should have recused himself from hearing this case. As Wright never sought recusal, our review is limited to plain error affecting his substantial rights. *Carines*, 460 Mich at 763. "A defendant in a criminal trial is entitled to expect a neutral and detached magistrate." *People v Cheeks*, 216 Mich App 470, 480; 549 NW2d 584 (1996) (cleaned up). A defendant claiming judicial bias must overcome a heavy presumption of judicial impartiality. *People v Wells*, 238 Mich App 383, 391; 605 NW2d 374 (1999).

On February 28, 2019, the trial court sentenced Wright for his convictions in the Davis case and in the present case. The court stated, "I am convinced after watching you during the trials and during . . . the motions and the sentence that you do not . . . know the difference between right and wrong." Wright noted that the same judge had presided over his trial in the Davis case and over a proceeding in which Banks pleaded guilty to perjury. Wright contends that the judge had a preconceived notion of his guilt and this preconceived notion influenced its decisions on motions regarding the admission of evidence.

The fact that the trial court had presided over the Davis case and Banks's plea proceeding did not mean that the trial court was biased or prejudiced against Wright. "Merely proving that a judge conducted a prior proceeding against the same defendant does not amount to proof of bias for purposes of disqualification . . . ." *People v White*, 411 Mich 366, 386; 308 NW2d 128 (1981). Furthermore, it was through the trial process in the two cases against Wright that the trial court reached its conclusion that Wright was "a cold-blooded murderer," who did not know the difference between right and wrong. "Judicial rulings, as well as a judge's opinions formed during the trial process, are not themselves valid grounds for alleging bias unless there is a deep-seated favoritism or antagonism such that the exercise of fair judgment is impossible." *People v Jackson*, 292 Mich App 583, 598; 808 NW2d 541 (2011) (cleaned up). Wright points to nothing in the court's evidentiary rulings that suggests that the court held a deep-seated favoritism or antagonism such that it was impossible for it to exercise fair judgment. Wright has not overcome the heavy presumption of judicial impartiality.

## VIII. PROSECUTORIAL MISCONDUCT

Finally, Wright contends that the prosecutor improperly opined on the content of deleted text messages between Wright and Swift during closing arguments. We review de novo claims of prosecutorial misconduct. *People v Fyda*, 288 Mich App 446, 460; 793 NW2d 712 (2010). A prosecutor may not make a statement of fact to the jury that is unsupported by the evidence. However, the prosecutor has wide latitude to argue the evidence and all reasonable inferences arising therefrom as it relates to his theory of the case. *People v Dobek*, 274 Mich App 58, 66; 732 NW2d 546 (2007). The prosecutor used the evidence—including the number of times that Wright communicated with Swift before Swift was murdered, Stokes's testimony that Swift

wanted Wright to turn himself in, Wright's deletion of the text messages from his phone, and the reasonable inferences from this evidence—to argue that the text messages between Wright and Swift were about the shooting of Davis and that Wright took Swift's phones and deleted the text messages so that no one could discover them. This argument was supported by the evidence and was therefore proper.

Wright also argues that defense counsel was ineffective for not objecting to improper prosecutorial statements in opening and closing. Wright filed a motion in this Court to remand for a hearing pursuant to *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973), to further develop his ineffective assistance of counsel claim. This Court denied that motion. *People v Wright*, unpublished order of the Court of Appeals, entered October 6, 2020 (Docket No. 348251). A *Ginther* hearing remains unnecessary as Wright's challenges to counsel's performance can be adequately reviewed on the existing record.

To obtain relief under an ineffective assistance theory, a defendant must demonstrate that his counsel's performance fell below an objective standard of reasonableness and that but for counsel's deficient performance, there is a reasonable probability that a different outcome would have obtained. *Strickland v Washington*, 466 US 668, 687; 104 S Ct 2052; 80 L Ed 2d 674 (1984). To establish that counsel's performance was deficient, a defendant must show that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms. *People v Solmonson*, 261 Mich App 657, 663; 683 NW2d 761 (2004). "Effective assistance of counsel is presumed, and a defendant bears a heavy burden to prove otherwise." *People v Traver*, 328 Mich App 418, 422; 937 NW2d 398 (2019) (cleaned up).

The purpose of an opening statement is to tell the jury what the advocate intends to prove. *People v Moss*, 70 Mich App 18, 32; 245 NW2d 389 (1976). In the remarks challenged by Wright, the prosecutor informed the jury what it would hear and learn from the trial testimony. Because the prosecutor was using her opening statement for its proper purpose, any objection by defense counsel would have been futile. Furthermore, to the extent that the prosecutor misrepresented what the subsequent testimony ultimately showed, any prejudice was cured by the jury instructions. The trial court instructed the jury both before the attorneys' opening statements and after their closing arguments that the attorneys' arguments were not evidence and could not form the basis of a conviction. A jury is presumed to follow its instructions. *People v Benton*, 294 Mich App 191, 202; 817 NW2d 599 (2011). Accordingly, even if defense counsel knew that the prosecutor misrepresented what the testimony would show and performed deficiently by failing to object, there is no reasonable probability that an objection would have altered the trial evidence.

Wright contends that the prosecutor belittled the defense for not offering an alibi defense. The prosecutor's remark merely pointed out that the defense had not presented an alibi to challenge the evidence that Wright was at Swift's house at the time Swift was killed. Again, as the prosecutor's remarks were proper, defense counsel was not ineffective for failing to object to them.

Wright argues that the prosecutor improperly commented on the veracity of Wells and Susan Schroeder, a neighborhood witness, when she stated that these witnesses were "mistaken" about certain things they saw. A prosecutor may properly use the evidence to challenge a witness's credibility. *People v Bennett*, 290 Mich App 465, 478; 802 NW2d 627 (2010). The prosecutor used an experiment conducted by investigating detectives to argue that Schroeder was mistaken

when she testified that she saw a man and woman enter Swift's apartment on January 19. The prosecutor used body cam videos to argue that Wells was mistaken when she testified that she saw the light and fan on in the living room of Swift's house on January 18. Because the prosecutor's remarks were proper, defense counsel was not ineffective for failing to object.

Wright argues that the prosecutor falsely stated that there had been testimony that Swift had a gun in the past and improperly insinuated that Adams refused to give Wright an alibi because he had multiple girlfriends. To the extent that these remarks could be deemed improper, there is no reasonable likelihood that an objection would have impacted the result of the trial. The remarks were isolated and as noted, the jury was instructed that it could only consider the evidence and not the attorneys' arguments in reaching a verdict.

We affirm.


/s/ Christopher M. Murray
/s/ Karen M. Fort Hood
/s/ Elizabeth L. Gleicher