*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

JAMES EDWARD MATTHEWS,

Defendant-Appellant.

UNPUBLISHED
July 28, 2025
2:54 PM

No. 363154
Wayne Circuit Court
LC No. 18-007023-01-FC

Before: MALDONADO, P.J., and BOONSTRA and WALLACE, JJ.

PER CURIAM.

Defendant, James Edward Matthews, appeals as of right his jury-trial conviction of first-degree murder, MCL 750.316(1)(a). The trial court sentenced defendant to life in prison without the possibility of parole. Finding no errors requiring reversal, we affirm.

## I. BASIC FACTS

Defendant was charged with the January 2003 premeditated killing of Marcella Robinson in Detroit. The first trial ended in a mistrial as a result of a hung jury. This appeal follows defendant's retrial. Although defendant was only charged with one count of first-degree murder, the facts pertaining to two other murders were introduced as evidence at trial pursuant to MRE 404(b). The other murders occurred in Detroit in May 1999 and in New York City in 2007.

## A. 2003 DETROIT MURDER

In 2003, defendant lived at 11421 St. Mary's Street in Detroit. On the evening of January 9, 2003, Camille Leak and defendant went to defendant's home to get high. They went into the

-1-

basement to defendant's room, sat on a bed, and smoked crack cocaine.[1] Defendant subsequently gave Leak $50 to go procure more crack cocaine on five or six occasions that night.

During the night, Leak saw defendant with various items in his hand that concerned her. At various points, defendant was holding an ice pick, a knife, and a Swiss Army-type knife. In each instance, Leak grabbed the item and threw it across the room. At some point, defendant's demeanor changed, and, according to Leak, he indicated that he wanted to have sex. Leak testified that she did not want to have sex with defendant, and while wondering about how she was going to extract herself from the situation, there was a knock on the door, after which defendant let a woman into the house. According to Leak, the woman wanted to "party." Defendant asked Leak to get some more drugs, but she declined and took the opportunity presented by the other woman's arrival to leave.[2]

Although she was not sure of the time, Leak testified that it was around 2:00 a.m. or 2:30 a.m. when she left. She walked to a friend's home approximately eight or nine blocks away to get some sleep. On the way there, Leak ran into Robinson. Robinson asked Leak where she was coming from, and Leak said she had just left defendant's house. Leak said that Robinson was wearing a denim skirt and denim shirt and had no visible injuries. After arriving at her friend's home and lying down upstairs, Leak at one point turned and saw defendant standing in the doorway of the room. This scared her because she did not know how defendant knew she went there after leaving his house. Defendant, who was holding a (presumably empty) 40-ounce bottle of beer upside down, then asked Leak if she had seen Robinson. Leak said she had, after she left his house. Defendant then explained that Robinson had taken $50 from him. Defendant also asked what Robinson was wearing, and when Leak described what she saw earlier, defendant claimed, "no, she didn't have that on" and left.

Later that morning (January 10, 2003), Leak left her friend's house and was walking toward a restaurant to have breakfast. When she neared St. Mary's Street, Leak saw that the street was blocked off with yellow crime scene tape and could see what appeared to be Robinson lying on the ground in front of defendant's next-door neighbor's porch.[3] Leak could see that Robinson was wearing denim and a Fila jacket that she was known to wear. An evidence technician who investigated the crime scene testified that Robinson was only wearing one boot and that the other boot was found on the ground a few feet from her body, near defendant's porch.

Photographs admitted as evidence showed a drag mark of suspected blood on defendant's porch. According to the evidence technician, the drag mark was approximately 4 feet in length

---

[1] Defendant maintains that he actually never smoked any crack cocaine that night. Instead, he claimed to have surreptitiously replaced any crack cocaine Leak gave him with a home-made concoction that was not cocaine.

[2] This other woman's identity is not known; in any event, she is not the victim.

[3] As indicated in the police sketch and photos, defendant's porch is closer to the street than his neighbor's porch. Thus, while the body was directly in front of the neighbor's porch, it was fairly even with or lateral to defendant's porch.

and appeared to lead to the side edge of the porch, i.e., toward the location of Robinson's body. Possible blood was seen inside defendant's home as well, and later DNA testing indicated that Robinson's DNA was present in the swabs of the suspected blood taken from the living room and kitchen walls.[4] Other DNA testing was conducted on oral and vaginal swabs of Robinson, which revealed that defendant's DNA was present in both.

Dr. Dan Galita performed the autopsy on Robinson. He found Robinson's bra and underwear were inside a plastic bag that had been tucked into the right sleeve of Robinson's jacket. Dr. Galita noted that Robinson had horizontal bruise marks across her neck, which were consistent with manual compression, and abrasions and contusions around the head, neck, and face area. He opined that the cause of Robinson's death was manual strangulation and the manner was homicide. Dr. Galita also noted that Robinson's toxicology report showed the presence of cocaine.

At trial, some statements defendant made were introduced into evidence. Defendant's sister-in-law, Yolanda Williams, testified that, while at a family gathering in the summer of 2003, she saw defendant and another man "messing around" and defendant put his hands around his neck. In response, another person yelled something to the effect of, "Don't let James put his hands around your neck because he'll kill a bitch in a minute," to which defendant replied, "That bitch shouldn't of messed with my money." According to Williams, Defendant also said that he gave this girl $50 and she did not come back. After defendant was arrested in 2018, an EMS official overheard him bragging to other detainees, "You don't know how many bodies I have on me."

## B. MRE 404(b) EVIDENCE

At trial, the prosecution introduced evidence of other murders that were purportedly committed by defendant: the 1999 murder of Deborah Brown in Detroit, and the 2007 murder of Raychelle Selby in New York City.[5]

An evidence technician testified that, in May 1999, Brown's body was found in an alley behind defendant's St. Mary's house in Detroit. Brown was not wearing any shoes, her underwear was tucked inside her pants pocket, and her jacket was zipped up covering her head. When the jacket was unzipped, it was revealed that Brown's head was covered with a plastic bag. A medical examiner testified that Brown's cause of death was manual strangulation and blunt force head trauma.

The second homicide occurred in New York City in 2007. A captain from the New York City Fire Department testified that Selby was found inside her own apartment with a plastic bag over her head and many cords wrapped around her neck. A former detective from the New York

---

[4] Inexplicably, a sample was never collected from the apparent 4-foot-long drag mark of suspected blood from the porch.

[5] The prosecution also sought to introduce other acts evidence of a 2008 criminal sexual conduct and assault with intent to murder of a woman in New York City, but the trial court did not allow it.

City Police Department testified that dozens of cigarette butts from the apartment were taken into evidence and one of them tested positive for defendant's DNA.[6] Additionally, a latent print examiner from the New York City Police Department testified that a palmprint taken from the apartment matched defendant's print. A forensic pathologist testified that Selby's cause of death was ligature strangulation.

## C. TRIAL PROCEEDINGS

On the morning of the first day of trial, defense counsel requested a competency hearing for defendant. Counsel maintained that it had been exceedingly difficult to work with defendant, such that defendant's inability to "stay on point" precluded him from assisting an attorney in his defense. Regarding defendant's competency, the trial court admonished defendant and encouraged him to work and cooperate with defense counsel. The court took some comfort in the fact that the first thing defendant did that morning was apologize for an outburst in a previous proceeding; the court found that defendant's actions showed that he understood the gravity of the situation. The trial court did not find any basis for finding that defendant was not competent for trial. Defendant also acknowledged that he understood he was on trial for first-degree premeditated murder.

On the third day of trial, defense counsel renewed his request for a competency evaluation for defendant. Counsel explained that he was getting multiple versions of events from defendant, and he had no idea which one "to roll with." The court questioned defendant as follows:

> *Q*. . . . So, Mr. Matthews -- I mean, from everything he's said to me and all the utterances I heard he's oriented to time and place. He knows -- I mean, you know where you are, right?
>
> *A*. Yes, sir.
>
> *Q*. And you're on trial. You know that, right?
>
> *A*. Yes, sir.
>
> *Q*. And you've been through this trial before once, once before a few years ago, right?

---

[6] The presence of defendant's DNA was presented through criminalist Lisa Mertz, who worked in the Office of the Chief Medical Examiner in New York City. Mertz performed a "technical review" of work done by a criminalist named Kareem Belt. Belt, who was no longer employed as a criminalist at the time of defendant's trial, authored a report finding that defendant's DNA was present on a cigarette butt collected from Selby's apartment. Notably, neither Belt nor Mertz actually conducted or performed the DNA testing itself. After reviewing the entire file, Mertz concluded that all of the proper procedures and processes were followed. In her review of the data, Mertz made her own independent conclusion that defendant's DNA was on the cigarette butt from Selby's apartment. Belt's report and conclusions were not admitted into evidence.

-4-

*A.* Yes, sir.

*Q.* And you remember that?

*A.* Yes.

*Q.* And Mr. Cooper is your fourth or fifth lawyer, right?

*A.* Yes, sir.

*Q.* And he is here to help you. You know that, right?

*A.* Yes, sir.

*Q.* And, you know, any kind of direction that he might give you is a way you can help. I mean, you need to help him in any way he thinks you should. Now, while we're in trial, I mean, we're not in trial right at the moment, but while we are in trial you're better off kind of leaving him alone and letting him concentrate on what's going on --

*A.* Yes, sir.

*Q.* -- rather than, you know, listening to you. And you know who I am and what my role is here, right?

*A.* Yes, sir.

Later during this same day while Camille Leak was testifying for the prosecutor on direct examination, defense counsel asked for a sidebar. After the sidebar, the court instructed the deputies to remove defendant from the courtroom. The court told defendant that he was "talking too much." Defendant was placed in a room containing a speaker system that allowed him to listen to the trial. Although what was said during the sidebar was not captured in the transcript of the proceedings, the trial court acknowledged and appellate counsel conceded that defense counsel requested defendant's removal.

After Leak was done testifying and the jury was excused, the trial court addressed defendant's removal on the record. The court recognized that such an action is "a drastic measure which is to be undertaken only under the most extreme circumstances." Defense counsel stated that defendant simply would not stop talking to him during Leak's testimony, which made it impossible for him to focus on what was being said, and which jeopardized his ability to adequately provide a defense. The court opined that removing defendant was the best way to ensure a fair trial.

During a break, defense counsel met with defendant, and noted that defendant agreed with the removal and did not "plan on acting out or acting up in any way in the future." The court noted and defense counsel agreed that this was evidence of his competence. The court allowed defendant to return to the courtroom. Defendant then personally addressed the trial court and voiced his agreement with the earlier decision to remove him.

The jury convicted defendant of the first-degree premediated murder of Robinson.[7]

## II. DENIAL OF COMPETENCY EVALUATIONS

Defendant argues that the trial court erred when it denied his requests for a competency hearing.

## A. PRELIMINARY MATTERS

In his brief on appeal, defendant challenges both the way the trial court handled defense counsel's requests for a competency hearing during trial and the court's denial of defendant's postjudgment motion (filed by appellate counsel) for a new trial or competency hearing. Plaintiff asserts that the latter argument is improperly before this Court because it was not mentioned in defendant's statement of the questions presented. We agree with plaintiff. The question presented for this issue is as follows:

> Was Mr. Matthews incompetent to stand trial; did *trial counsel's* requests for a competency evaluation coupled with Mr. Matthews's *in-court conduct* leave the trial court with more than a bona fide doubt about Mr. Matthews's competency to proceed, and in failing to refer Mr. Matthews for a competency evaluation, did the trial court violate his state and federal rights to due process? [Emphasis added.]

The above question presented relates solely to trial counsel's requests for the competency evaluation. Consequently, any challenge to the trial court's denial of the postjudgment motion for new trial or evidentiary hearing as to this issue is not properly before this Court, and we deem it abandoned. See MCR 7.212(C)(5); *People v Haynes*, 338 Mich App 392, 435 n 5; 980 NW2d 66 (2021); *People v Miller*, 238 Mich App 168, 172; 604 NW2d 781 (1999).

Moreover, even if the issue had been properly presented in defendant's statement of the questions presented, the facts of the present case are distinguishable from the case upon which defendant primarily relies, *People v Lucas*, 393 Mich 522; 227 NW2d 763 (1975). In *Lucas*, the Michigan Supreme Court held that "it is incumbent upon a defendant claiming error for noncompliance with the statutory, court rule, or constitutional provisions respecting competency to stand trial to present a motion for new trial, or delayed motion for new trial, seeking an evidentiary hearing at the trial court level *before* claimed error will be considered upon appeal." *Id*. at 529 (footnote omitted). In the present case, defendant filed a motion for new trial seeking an evidentiary hearing on the issue of competency, but he did not allege that the trial court failed to comply with statutory, court rule, or constitutional provisions respecting competency to stand trial. On appeal, defendant likewise does not argue that the trial court failed to comply with the statutory or court rule provisions pertaining to this issue. However, defendant argues on appeal that denial of his motion for new trial violated his constitutional "due process right against being

---

[7] More than a year after filing his claim of appeal in this Court, defendant moved for a new trial, or at least an evidentiary hearing, in the trial court. Among the issues raised by defendant were that he was incompetent at the time of trial and that his exclusion from the courtroom violated his right to be present. The trial court denied the motion in its entirety.

tried and convicted while competent." Because defendant has not filed a motion for new trial at the trial court level claiming error for noncompliance with any statutory, court rule, or constitutional provisions respecting competency to stand trial, we find that this case is distinguishable to from *Lucas*. Thus, even if defendant had properly presented this issue on appeal, we would find that the trial court did not err when it denied defendant's postjudgment motion.

## B. ANALYSIS

Turning to the issue that is properly presented to this Court, defendant argues that the trial court erred when it declined to order a competency evaluation for defendant after his trial counsel made two requests during trial. We disagree. This Court reviews the trial court's decision regarding a defendant's competency to stand trial for an abuse of discretion. *People v Kammeraad*, 307 Mich App 98, 138; 858 NW2d 490 (2014).

"A defendant who is determined incompetent to stand trial shall not be proceeded against while he is incompetent." MCL 330.2022(1). MCL 330.2020(1) provides:

> A defendant to a criminal charge shall be presumed competent to stand trial. He shall be determined incompetent to stand trial only if he is incapable because of his mental condition of understanding the nature and object of the proceedings against him or of assisting in his defense in a rational manner. The court shall determine the capacity of a defendant to assist in his defense by his ability to perform the tasks reasonably necessary for him to perform in the preparation of his defense and during his trial.

"The issue of competence can only be raised by evidence of incompetence." *People v Blocker*, 393 Mich 501, 508; 227 NW2d 767 (1975).

> Although the determination of a defendant's competence is within the trial court's discretion, a trial court has the duty of raising the issue of incompetence where facts are brought to its attention which raise a "bona fide doubt" as to the defendant's competence. However, the decision as to the existence of a "bona fide doubt" will only be reversed where there is an abuse of discretion. [*Kammeraad*, 307 Mich App at 138 (quotation marks and citation omitted).]

"The test for such a bona fide doubt is whether a reasonable judge, situated as was the trial court judge whose failure to conduct an evidentiary hearing is being reviewed, should have experienced doubt with respect to competency to stand trial." *Id*. at 138-139 (quotation marks, citation, and bracket omitted).

> [E]vidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial are all relevant in determining whether further inquiry is required, but that even one of these factors standing alone may, in some circumstances, be sufficient. There are, of course, no fixed or immutable signs which invariably indicate the need for further inquiry to determine fitness to proceed; the question is often a difficult one in which a wide range of manifestations and subtle nuances are implicated. [*Drope v Missouri*, 420 US 162, 180; 95 S Ct 896; 43 L Ed 2d 103 (1975).]

-7-

At the outset of the first day of trial, before trial counsel's first request for a competency evaluation, defendant apologized to the trial court for disrespecting it at a previous hearing. The court later noted this as indicative of defendant's competence, because it demonstrated that he understood the import of his actions and the seriousness of the trial. Defense counsel's primary argument in the trial court that first day was that defendant did not possess the ability to "stay on point" in communications, which made it difficult to prepare a defense. Counsel explained that he was only able to pick up "a piece here and a piece there" regarding retorts to the prosecution's various allegations. However, defense counsel also acknowledged that it was "real clear," at times, that defendant completely understood everyone's role in the proceedings. And defendant admitted to the trial court that he understood the purpose of the instant trial.

On appeal, defendant focuses on the following comments defendant made to the trial court:

Um, I'm really, um, I'm a little confused with what's really going on here because I have never understood how me having a job coming to your home, cooking for you, cleaning for you, my cigarettes in the ashtray, somebody kill you and I get charged for it. I come at my house and a body's laying there and I get charged for it.

I never really understood what's going on, okay. All these allegations against me, I don't know what's going on and I get mad with him because he tried to explain it to me and I'm steady telling him I'm innocent.

While defendant did say that he was "confused" with what was happening and did not understand why he was there, those comments must be viewed in context. Read properly, defendant was not confused about the nature of the proceedings. Instead, he was confused that he could be charged for this crime when he supposedly did not commit it. The comment about having a job, coming to "your" home, and cooking for "you," were referring to defendant doing those things for the victim Selby in New York City (regarding whom the prosecution was offering MRE 404(b) evidence).[8] He thought it unfathomable, i.e., "confusing," that, while engaging in no wrongdoing, he could nonetheless be alleged to have killed her. This interpretation is consistent with defendant's later admission that he understood that the trial was about whether he committed first-degree murder. Defendant's comments were not evidence of incompetence.

Significantly, defendant acknowledged having previously behaved poorly and disruptively toward the judge and his trial counsel. Regarding his outbursts to the trial judge, defendant admitted that he did so because "I figured if I fuss at you, cuss you out[,] you would put me to another Judge." And regarding his behavior toward his attorney, defendant stated that he "get[s] mad" at his attorney explaining all the allegations against him regarding which he claims his innocence. Moreover, although a lawyer's representation that his client is incompetent is a factor which should be considered, a trial court is not required to "accept without question a lawyer's representation concerning the competence of his client." *Blocker*, 393 Mich at 516. The trial court also noted that defendant's demeanor in the courtroom "clear[ly]" did not indicate a lack of

---

[8] Defendant later testified that he would pick up grocery items and go over to Selby's apartment and smoke cigarettes while he cooked.

competence. This Court generally defers to a court's findings related to demeanor and attitude. *Kammeraad*, 307 Mich App at 141.

Because a reasonable judge could have concluded that there was not a bona fide doubt regarding defendant's competence on the first day of trial, the trial court did not abuse its discretion when it declined to order a competency evaluation that day. *Id*. at 138-139.

On the third day of trial, defense counsel renewed his request for a competency evaluation. He complained to the trial court that defendant was talking incessantly and providing different versions of what happened, such that he did not know "which version to roll with." The trial court noted that having multiple versions of events is not itself an indication of incompetence, but can often indicate that the person cannot keep his lies straight. Despite this view of defense counsel's argument, the court nonetheless questioned defendant about whether he understood what was happening, whether he understood that defense counsel was there to help him, and whether he understood the judge's role. Defendant consistently responded that he understood.

The trial court also did not abuse its discretion by denying defense counsel's renewed request for a competency evaluation. Notably, counsel did not divulge the content of his communications with his client, but rather, only disclosed that defendant was talking a lot and providing differing versions of events. Additionally, defendant was able to listen to and cogently answer the court's questions. From this, it was reasonable for the trial court to not have "experienced doubt with respect to [defendant's] competency to stand trial." *Kammeraad*, 307 Mich App at 138-139.

Additionally, while defendant abandoned any challenge to the trial court's denial of the postjudgment motion for new trial or evidentiary hearing as to his requests for a competency hearing by not including it in his questions presented, even if this issue were properly raised, we would still find that the trial court did not thereby abuse its discretion. At the motion hearing, the trial court relied on its own interactions with defendant to show that he was competent to stand trial. It gave little weight to defendant's expert's opinion that defendant lacked capacity either to understand the nature and quality or the wrongfulness of his conduct or to conform his conduct to the requirement of the law under MCL 768.21a(1) because he was attempting to ascertain defendant's competency from approximately sixteen months earlier.

## III. RIGHT TO BE PRESENT

Defendant argues that he is entitled to a new trial because his right to be present was violated. We disagree.

## A. PRESERVATION

When defendant was removed from the courtroom at his own counsel's request, he did not contemporaneously raise a constitutional objection. Defendant nevertheless raised this issue in his subsequent motion for new trial or evidentiary hearing. "The purpose of the appellate preservation requirements is to induce litigants to do what they can in the trial court to prevent error and eliminate its prejudice, or to create a record of the error and its prejudice." *People v Mayfield*, 221 Mich App 656, 660; 562 NW2d 272 (1997). "To preserve for review by this Court a constitutional-error claim that implicates a defendant's due-process rights, the issue must be raised in the trial

court." *People v Anderson*, 341 Mich App 272, 279; 989 NW2d 832 (2022). Where defendant's own counsel had him removed from the courtroom, one would not expect a defendant to make their own contemporaneous objection. In this circumstance, we will presume that raising a constitutional objection to the removal in a post-judgment motion satisfies the preservation requirement.

## B. STANDARD OF REVIEW

Defendants possess both statutory and constitutional rights to be present at trial. *People v Mallory*, 421 Mich 229, 246 & n 10; 365 NW2d 673 (1984), citing MCL 768.3; US Const, Am VI; and Const 1963, art 1, § 20. Defendant only raises the constitutional aspect on appeal.

As a result, we review this constitutional issue de novo to determine whether any error was harmless beyond a reasonable doubt. *People v Bruner*, 501 Mich 220, 226; 912 NW2d 514 (2018); *People v Dendel (On Second Remand)*, 289 Mich App 445, 475; 797 NW2d 645 (2010). Additionally, the right to be present constitutes a non-structural error. "[T]he list of structural errors that the [United States] Supreme Court has recognized is short and limited, and the Supreme Court has never held that the exclusion of a defendant from a critical stage of his criminal proceedings constitutes a structural error." *Anderson*, 341 Mich App at 284 (quotation marks, citation, and brackets omitted); see also *United States v Williams*, 974 F3d 320, 348 (CA 3, 2020) ("The Supreme Court has made clear that violations of the right to be present are subject to harmless-error review."). Preserved constitutional error that is nonstructural will not merit reversal if the error was harmless beyond a reasonable doubt. *Id*.

## C. WAIVER

The right to be present is not absolute and can be waived. *People v Staffney*, 187 Mich App 660, 663; 468 NW2d 238 (1990).

This case involves competing principles. Defendant does not dispute that it was his trial counsel who requested his removal and that the trial court simply granted the request. Typically, such action would render an issue waived. See *People v Jones*, 468 Mich 345, 352 n 6; 662 NW2d 376 (2003) ("Appellate review is precluded because when a party invites the error, he waives his right to seek appellate view, and any error is extinguished."); *Blazer Foods, Inc v Restaurant Props, Inc*, 259 Mich App 241, 252; 673 NW2d 805 (2003) (stating that a party may not take a position in the trial court and later seek redress on appeal that is based on a position contrary to that earlier position). However, the right to be present can only be waived personally by the defendant himself; defense counsel cannot waive the right on a defendant's behalf. *People v Montgomery*, 64 Mich App 101, 103; 235 NW2d 75 (1975).

> Waiver is defined as the intentional relinquishment or abandonment of a known right. A defendant can waive his right to be present by (1) voluntarily being absent after the trial has begun, or (2) being so disorderly or disruptive that his trial cannot be continued while he is present[.]
>
> It is not seriously questioned that a defendant has the power to waive constitutional rights, provided he does so intelligently, understandingly and voluntarily. *A valid waiver of a defendant's presence at trial consists of a specific*

-10-

*knowledge of the constitutional right and an intentional decision to abandon the protection of the constitutional right.* [*Buie*, 298 Mich App at 57 (quotation marks and citations omitted; emphasis added).]

A defendant can implicitly waive his right to be present at trial on account of disruptive behavior if, after being warned by the judge that he will be removed, he nevertheless continues such behavior. *Illinois v Allen*, 397 US 337, 343; 90 S Ct 1057; 25 L Ed 2d 353 (1970).

Defense counsel requested defendant's removal because defendant was constantly bothering him while Leak was testifying, making it nearly impossible for counsel to focus on what the witness was saying, which significantly impaired his ability to provide effective assistance. The record shows that while the trial court had previously admonished defendant to behave and to not incessantly bother his trial counsel, the court never apprised defendant of his right to be present and did not warn him that further disturbances would result in his removal from the courtroom. Under these facts, we must conclude that defendant did not knowingly and intelligently waive his right to be present. This is similar to the situation in *Buie*, where that defendant specifically asked to be excused from the courtroom, and the trial court granted his request. *Buie*, 298 Mich App at 58. Although the defendant voluntarily and intentionally wished to be absent from the proceedings, this Court found that the waiver was not valid because the record was silent regarding whether the defendant was ever specifically apprised of his constitutional right to be present. *Id.*; see also *Montgomery*, 64 Mich App at 103 ("[W]e cannot presume that the defendant waived his constitutional right on the basis of a silent or sketchy record.").

## D. ANALYSIS

Turning to the analysis of whether any error was harmless beyond a reasonable doubt, there was an error: defendant was removed from the courtroom without a valid waiver (either an express one or an implicit one as described in *Allen*).[9]

The next consideration is whether the error was harmless beyond a reasonable doubt. *People v Carines*, 460 Mich 750, 774; 597 NW2d 130 (1999), citing *People v Anderson (After Remand)*, 446 Mich 392; 521 NW2d 538 (1994). "[T]he test for whether defendant's absence from a part of his trial requires reversal of his conviction is whether there was any reasonable possibility that defendant was prejudiced by his absence." *People v Buie*, 298 Mich App 50, 59; 825 NW2d 361 (2012), quoting *People v Armstrong*, 212 Mich App 121, 129; 536 NW2d 789 (1995). While this is a significant burden, based upon our review of the record we are satisfied that the error is harmless beyond a reasonable doubt.

[W]hether . . . the error was harmless beyond a reasonable doubt . . . in a particular case depends upon a host of factors, all readily accessible to reviewing courts. These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, . . .

---

[9] The *Kammeraad* Court noted that an implicit waiver is really not a "waiver" but is more of a "forfeiture." *Kammeraad*, 307 Mich App at 118 n 6.

and, of course, the overall strength of the prosecution's case. [*Delaware v Van Arsdall*, 475 US 673, 684; 106 S Ct 1431; 89 L Ed 2d 674 (1986).]

Vital to this analysis, defense counsel requested defendant's removal because defendant's presence made it impossible for counsel to focus on the witness's testimony and provide effective assistance. Thus, the record clearly evidences that defendant's absence *inured to his benefit*.[10] On appeal, Defendant generally asserts that he was prejudiced because he was unable to confront Leak and that he could not adequately consult with defense counsel regarding Leak's testimony. Conspicuously missing from defendant's arguments is any specificity—there is no description of how his inability to be in the room while Leak testified had any tangible effect upon his defense. If an absence, by itself, is all that were necessary to demonstrate that the error was harmful, then allowing any proceeding in a criminal case to be conducted in front of a jury, where the defendant was not present, would be a structural constitutional error; however, as noted earlier, absence by itself *does not* constitute structural error. *Anderson*, 341 Mich App at 284.

Furthermore, this is not a situation where defendant was absent for the entirety of trial or even a large portion of it. Defendant was only removed for a portion of Leak's direct testimony and all of her cross-examination. While Leak was an important witness for the prosecution, defendant largely admitted to Leak's version of events as to what occurred between them on the night Robinson was killed in his own subsequent testimony. Defendant admitted that he and Leak went to his home that night to smoke crack cocaine and that he gave Leak $50 to go out and obtain more crack cocaine on five or six occasions. With defendant having no personal knowledge of what Leak saw or did while not in defendant's presence, including when she met Robinson on the street later that night, there is no reasonable possibility that defendant would have had anything impactful to tell his trial counsel during those aspects of Leak's testimony, had he been physically present.[11] The only significant difference between the testimony of defendant and the testimony of Leak, as it pertained to any moments they allegedly shared, was Leak's testimony that she was staying in a room on the second floor of her friend's house later that night, approximately eight or nine blocks away from defendant's, and was startled to turn and see defendant standing in the doorway. She testified that he asked if she had seen Robinson. When she said she had, defendant said Robinson had taken $50 from him, asked her what Robinson had on, disagreed about what she was wearing, and left. On the other hand, defendant denied seeing Leak again that night after she left his house. However, this testimony by Leak occurred on her direct examination some time before defendant was removed from the courtroom such that he would have had the opportunity to address it with his counsel.

After Leak's cross-examination, which defendant heard through the speaker system, defendant was returned to the courtroom, and he explicitly agreed with the decision to have him removed. As explained earlier, this does not constitute a waiver or ratification because defendant

---

[10] The trial court came to the same conclusion in denying defendant's postjudgment motion for a new trial or evidentiary hearing.

[11] Although defendant claimed to have employed a ruse with Leak wherein he only pretended to smoke the drug, that fact is not relevant to this analysis.

was never informed that he had a right to be present. See *Buie*, 298 Mich App at 58. But it does indicate that he had no issues with how his trial counsel handled witness Leak.[12] Had defendant thought there was something lacking in counsel's cross-examination of Leak or that defendant had information that would have assisted his counsel with that cross-examination, one would expect defendant to have mentioned it upon his return to the courtroom. As a result, defendant's acquiescence to being removed, while not adequate to constitute a waiver, is indicative that there was no reasonable possibility that he was prejudiced.

Defendant also maintains that he was prejudiced because the jury was told that he was removed for "talking too much." It should be noted that the court did not, per se, instruct the jury as to why defendant was removed—the court told defendant why he was being removed in the jury's presence. In any event, defendant does not explain how he was prejudiced by this. It seems absurd that a jury would view "talking too much" as a reason to convict a defendant of first-degree murder. Additionally, defendant contradictorily asserts that the jury was left to speculate why defendant had been removed. Because, as defendant elsewhere admits, the record is clear that the jury heard why defendant was removed from the courtroom, defendant's assertion is without merit. In any event, in our view, it was appropriate for the jury to learn why defendant was removed. Otherwise, the jury could speculate that defendant perhaps did something much more serious or egregious as opposed to merely "talking too much."

Lastly, defendant speculates that upon his removal, the jury may have seen "some sort of visible restraints or shackles" on him, in violation of the Fifth and Fourteenth Amendments. See *Deck v Missouri*, 544 US 622, 626; 125 S Ct 2007; 161 L Ed 2d 953 (2005). There is no evidence to suggest that defendant had any such restraints on, let alone any that the jury saw. This Court will not presume prejudice based on mere speculation. See *People v Elston*, 462 Mich 751, 762; 614 NW2d 595 (2000) (stating that an appellant bears the burden of furnishing the appellate court with a record to verify the factual basis of any argument upon which reversal is predicated). Accordingly, this argument is without merit.

## IV. "SURROGATE" WITNESS

Defendant argues that he is entitled to a new trial because his right to confrontation was violated when Lisa Mertz testified as a "surrogate witness." We disagree.

### A. WAIVER

Defendant initially objected to the admission of Mertz's testimony on the basis that it violated his right to confrontation thereby ostensibly preserving the issue for appeal. See *People v McPherson*, 263 Mich App 124, 137; 687 NW2d 370 (2004). However, plaintiff argues that after this objection, defense counsel waived the issue.

Waiver is "the intentional relinquishment or abandonment of a known right." *People v Carter*, 462 Mich 206, 215; 612 NW2d 144 (2000). Plaintiff maintains that, although defendant

---

[12] Referring to his counsel, defendant even stated, "He's good."

-13-

initially objected to Mertz's testimony on Confrontation Clause grounds, his later acquiescence to the admission of that testimony constituted waiver, thereby extinguishing any error.

On the morning of the fourth day of trial, Mertz was voir dired outside the presence of the jury. During the examination, the trial court asked defense counsel if he would have had any objection if Kareem Belt was testifying instead of Mertz, and defense counsel said that he would not have any objection. Later, this exchange occurred:

> *THE COURT*: Okay. So I guess my question to you then, Mr. Cooper, is if Belt could testify and Belt is no longer available and this witness did all of the same things that Belt did[,] why can't [Mertz] testify? I mean, if she were just -- if she just said, I looked at Belt's report and I think this is just fine, well, then of course she couldn't just simply repeat Belt's findings, but she undertook all of the work herself that Belt did to reach his findings.

> *MR. COOPER*: I guess I'm rethinking whether Belt's -- what you're saying is so obvious --

> *THE COURT*: Well, now you're going to rethink whether or not Belt's testimony would be admissible, right?

> *MR. COOPER*: Yeah, what you're saying is obvious and I would have no way of objecting, but --

> *THE COURT*: Yeah, well, that's another issue.

> *MR. COOPER*: Yeah, that's another issue.

> * * *

> *THE COURT*: . . . Well, Mr. Cooper, I think I'm going to let the witness testify to what she just testified to.

> *MR. COOPER*: I understand your decision. That's Rowe.

> *THE COURT*: Yea, that's Rowe.[13] Okay, agreed.

---

[13] From context, it seems that the trial court and defense counsel were referring to an opinion named "*Rowe*." However, we have not been able to discern which opinion that is. The court previously mentioned it reviewed three cases, but none was called "*Rowe*." The three cases were *Williams v Illinois*, 567 US 50; 132 S Ct 2221; 183 L Ed 2d 89 (2012), and "a couple of unpublished Michigan Court of Appeals decisions, *People v Warren* and *People v Fleming*," which we have deduced were *People v Warren*, unpublished per curiam opinion of the Court of Appeals, issued April 16, 2020 (Docket No. 344384), and *People v Fleming*, unpublished per curiam opinion of the Court of Appeals, issued July 23, 2020 (Docket No. 348592).

-14-

In *People v McDonald*, 293 Mich App 292, 295; 811 NW2d 507 (2011), the defendant's trial counsel stated that he had no objection to the admission of certain evidence. This Court noted that this act constituted a waiver. *Id*. However, it is not clear that defense counsel in the instant case made such an unequivocal statement. On the one hand, counsel saying that he "would have no way of objecting" seems to be an express acknowledgment that he had no viable objection under the Confrontation Clause. On the other hand, he indicated some hesitancy because his conclusion that he had no legal objection was based on a premise—that Belt could testify without any confrontation issues—that he was not sure was correct. Because defense counsel's assertion can be viewed as less than an unequivocal statement, we will not treat it as a waiver.

As a result, we review this preserved, constitutional issue de novo to determine whether any error was harmless beyond a reasonable doubt. *People v Bruner*, 501 Mich 220, 226; 912 NW2d 514 (2018); *People v Dendel (On Second Remand)*, 289 Mich App 445, 475; 797 NW2d 645 (2010).

## B. ANALYSIS

"A defendant has the right to be confronted with the witnesses against him or her." *People v Yost*, 278 Mich App 341, 369-370; 749 NW2d 753 (2008), citing US Const, Am VI; Const 1963, art 1, § 20; and *Crawford v Washington*, 541 US 36, 42; 124 S Ct 1354; 158 L Ed 2d 177 (2004). "Where testimonial evidence is at issue, . . . the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination." *Crawford*, 541 US at 68.

In this instance, it is manifestly apparent that, assuming any error occurred, and assuming the issue is preserved, it was harmless beyond a reasonable doubt. See *Strickland v Washington*, 466 US 668, 697; 104 S Ct 2052; 80 L Ed 2d 674 (1984) (stating that if it is easier to dispose of a constitutional claim of ineffective assistance of counsel on the ground of a lack of prejudice, that course should be followed).

The challenged evidence consisted of Mertz's testimony that defendant's DNA was found on one of dozens of cigarette butts that were found inside Selby's New York City apartment. That evidence placed defendant inside the apartment sometime before her murder; but it did not otherwise connect him to Selby's murder. Significantly, defendant's presence in that apartment was likewise established through other evidence at trial. First, his palmprint was found on a wall inside the apartment. Second, not only did defendant admit to being inside Selby's apartment, he also admitted that he cooked food and smoked cigarettes while there. As a result, the fact that Mertz testified that defendant's DNA was found on a single cigarette butt inside Selby's apartment is merely cumulative to other unchallenged evidence that was admitted at trial. Therefore, assuming any error existed with regard to Mertz's testimony, it is evident that it was harmless beyond a reasonable doubt.

Affirmed.

/s/ Allie Greenleaf Maldonado
/s/ Mark T. Boonstra
/s/ Randy J. Wallace

-15-